UNITED STATES of America, Appellee,

v.

Francisco J. PACHECO–ORTIZ,
Defendant, Appellant.

No. 88–2073.

United States Court of Appeals,
First Circuit.

Heard Aug. 1, 1989.

Decided Nov. 1, 1989.

Jeffrey A. Miller with whom Miller & Beilly, P.A., Fort Lauderdale, Fla., was on brief, for defendant, appellant.

Salixto Medina–Malave, Asst. U.S. Atty., Santurce, P.R., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for the U.S.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.

PER CURIAM.

Francisco J. Pacheco–Ortiz, the appellant, was convicted of one count of conspiracy to commit mail fraud and three counts of aiding and abetting mail fraud for his part in an insurance fraud scheme involving arson of warehouses. On appeal, he argues that the evidence at trial was insufficient to sustain his conviction; that the government failed to disclose exculpatory evidence; and that the district court should have excluded his grand jury testimony because he had testified without benefit of either *Miranda* or target warnings.

We affirm on all but one of the aiding and abetting counts. But we also find it necessary again to express our profound dissatisfaction with the failure of a United States Attorney's Office in this Circuit to abide by Department of Justice policies and procedures prescribing the giving of certain warnings prior to obtaining grand jury testimony from targets of an investigation. While this failure will not justify any ad-

---

* Of the District of Massachusetts, sitting by desig- nation.

verse action by us on this appeal, it does cause us to give notice that future violations of this policy—even when not justifying adverse action on the appeal—will likely result in official public reference of the matter by this court to the attention of the Office of Professional Responsibility of the United States Department of Justice.

# I

## A

On June 29, 1982, El Sol de America Express, Inc. ("Sol"), a moving and storage company owned by Angel Luis Ortiz–Colon, insured its main warehouse with Royal Insurance Company for $600,000. Later, after renting a secondary warehouse, Ortiz–Colon asked his insurance broker to extend the original policy to cover the new facility, to which he transferred various goods of modest value.

On November 18, 1982, the secondary warehouse burned down.

Ortiz–Colon filed an insurance claim for approximately $200,000 in losses at the secondary warehouse. Among the supporting documents were two contracts, one in the name of appellant and one in the name of his wife. However, because a misunderstanding had prevented the extension of coverage to the secondary warehouse, Royal Insurance Company denied Ortiz–Colon's claim and cancelled his policy.

On April 4, 1983, Ortiz–Colon bought new coverage for Sol's main warehouse from Santiago Rentas Martinez, a broker he had met at appellant's real estate office. The policy was issued by Sun Alliance Insurance Company. Rentas testified at trial that he would not have issued the policy had Pacheco or anyone else told him about the November 1982 fire.

On April 24, 1983, Sol's main warehouse burned down.

Sun Alliance referred the resulting claim to Benjamin Acosta, the same adjustor who had investigated the earlier fire. After examining supporting documents supplied by Ortiz–Colon, Acosta, suspecting in his words "that the whole thing was a fraud but [having] no evidence to prove it," settled the claim for $125,000.

One of the supporting documents supplied by Ortiz–Colon to Acosta in support of the claim was a contract in the name of Antonio Gonzalez. At trial, Gonzalez testified that he had signed the document at the urging of appellant, and that it had been blank when he signed it. Gonzalez stated that he had neither lost any merchandise with Sol nor authorized the filing of the contract to support an insurance claim.

Sun Alliance filed an action in the Superior Court of Puerto Rico, apparently in the nature of interpleader, in which, as its lawyer testified, it attempted

> to consign in the Superior Court of Bayamon the sum of $125,000 to Sol de America Express so that the Superior Court of Bayamon could consign or distribute those $125,000 to Sol de America Express and the third parties who stored the property in the warehouses.

Sol answered the Sun Alliance consignment complaint on June 1, 1983, and moved to be permitted to recover the entire $125,000. By a judgment entered the same day all the monies were turned over to Sol. Sun Alliance thereafter found itself embroiled in disputes with third parties who alleged that they were entitled to a portion of those settlement proceeds.

## B

Appellant appeared before the grand jury on November 16, 1987. The record does not disclose that the prosecutor provided any warnings regarding either appellant's right against self-incrimination or his status as a target of the grand jury's investigation.[1]

Two days later, on November 18, 1987, the grand jury charged Ortiz–Colon, appellant, and several others with conspiracy to

---

1. Mr. Medina, the Assistant United States Attorney, has made somewhat inconsistent representations in the briefing and argument before us regarding the issue of warnings, *see infra* note 7.

These various representations, however, concern matters not reflected in the record of proceedings before the grand jury or the District Court.

commit mail fraud and mail fraud; Ortiz–Colon was also charged with arson and obstruction of justice. The grand jury returned a superseding indictment on January 13, 1988.

The fraud scheme as alleged in the superseding indictment was one to "obtain money and property, by means of false and fraudulent pretenses, representations, and promises from the Royal Insurance Company of Puerto Rico, Inc., the Sun Alliance Insurance Company of Puerto Rico, Inc., and the Superior Court of Puerto Rico, Bayamon District."

Trial commenced on May 9, 1988. On May 10, Ortiz–Colon and two other defendants entered guilty pleas. After trial, all remaining defendants except appellant were acquitted of all counts against them. Pacheco was convicted of Count I, the conspiracy count, and Counts 22–24, three mail fraud counts relating to the fire at the main warehouse.

## II

Appellant's argument regarding sufficiency of the evidence has two components. First, Pacheco contends that the government proved only a "legitimate arms length business relationship," Appellant's Brief at 24, between him and Ortiz–Colon, not a conspiracy. Second, he claims that the mailings which form the basis of Counts 22–24 were not in furtherance of the scheme.

On appeal, we will hold "the evidence ... sufficient if a reasonable person could fairly find [Pacheco] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government." *United States v. Santiago*, 828 F.2d 866, 870 (1st Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988).

### A

#### *Conspiracy*

■ "The gist of conspiracy is an agreement to disobey or to disregard the law." *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984). The government must prove "intent to agree and intent to commit the substantive offense." *Id.* The evidence need not be direct; agreement and intent may be proved circumstantially. *Id.; United States v. Alemany Rivera*, 781 F.2d 229, 234 (1st Cir.1985), *cert. denied*, 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986). Moreover, "a conspiratorial agreement need not be express, but may consist of no more than a tacit understanding." *Id.* However, the government must prove "that each defendant knowingly and intentionally joined th[e] conspiracy." *United States v. Hensel*, 699 F.2d 18, 33 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317; 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 99; 464 U.S. 824, 104 S.Ct. 94, 78 L.Ed.2d 100 (1983).

■ Several witnesses supported the conspiracy charge against Pacheco. Although appellant testified before the grand jury that he had visited Ortiz–Colon at Sol's warehouse no more than twice, government witnesses testified at trial that Pacheco had visited Sol "many times" or "often," and had had private conversations with Ortiz–Colon in the latter's office. Additionally, there was evidence suggesting that appellant helped Ortiz–Colon obtain new insurance when his policy was cancelled after the first fire.

Most damaging to Pacheco was the testimony of Antonio Gonzalez Ramos. Gonzalez testified that after the second fire, he was asked by Pacheco to sign a blank Sol contract. Gonzalez testified further that he at first refused, but Pacheco "assured me that this document wouldn't get me into any trouble because after this was presented to the insurance company that's where it would stay and nothing else would happen with it." The contract was later filled out and presented to the insurance adjustor as evidence of loss, even though Gonzalez never lost any merchandise with Sol nor authorized filing of the contract to support Sol's claim.

Appellant tells us that we "must necessarily discount" Gonzalez's testimony because of its many flaws and inconsisten-

cies.[2] However, it is hornbook law that "[w]e must resolve any issue of credibility in favor of the jury's verdict, and we must defer to the jury's verdict if the evidence can support varying interpretations." *United States v. McNatt*, 813 F.2d 499, 502 (1st Cir.1987) (citations omitted).

Considering all of the evidence in the light most favorable to the government, we have no difficulty holding that the jury had before it sufficient evidence to support the verdict.

### B

### *Mail Fraud*

Appellant's second sufficiency contention is that the mailings which form the basis of Counts 22–24 were not sent or caused to be sent "for the purpose of executing [the fraudulent] scheme." 18 U.S.C. § 1341.

That language from the mail fraud statute has been given a "liberal construction" by this court and others. *United States v. Serino*, 835 F.2d 924, 928 (1st Cir.1987).

> It is not necessary ... that each mailing guarantee the success of the scheme, or even significantly advance it. "A mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions." ... It is sufficient that the mailings are incident to defendants' efforts in furtherance of the scheme.
>
> ... [T]he focus ought to be concerned less with the precise contents of the particular mailings than with the role those mailings played in the execution of the scheme.

*Id.* (quoting *United States v. Silvano*, 812 F.2d 754, 760 (1st Cir.1987)). However, for the mailings to be considered "in furtherance of the scheme, 'the scheme's completion or the prevention of its detection must have depended in some way'" on the mailings. *United States v. Pietri Giraldi*, 864 F.2d 222, 224 (1st Cir.1988) (quoting *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir.1986)). *See generally United States v.*

*Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

In a comprehensive discussion of the precedents involving the role of mailings related to insurance company actions in response to fraudulent schemes, Chief Judge Lay for the Eighth Circuit identified various circumstances which can place a mailing alternatively within or without the mail fraud statute. *United States v. Leyden*, 842 F.2d 1026 (8th Cir.1988).

Clearly within the mail fraud statute as furthering the illegal scheme are those mailings that:

—assist the criminal in carrying out the fraud; or

—delay discovery of the fraud.

*Id.* at 1028.

By contrast, outside the statute as not furthering the illegal scheme are those mailings that:

—serve to put the defrauded party on notice regarding the fraud;

—make the execution of the fraud less likely;

—oppose the scheme; or

—disclose the nature of the fraud.

*Id.* at 1030.

The mailings at issue here consisted of:

(1) a May 6, 1983, letter from the independent adjustor, Acosta, to Sun Alliance which recommended that the claim be settled, relying on the false contracts presented by Ortiz–Colon (Count 22);

(2) a May 18, 1983, letter from Acosta to Ortiz–Colon requesting more documentation so that the settlement could go forward (Count 23); and

(3) an August 23, 1983, mailing from Acosta to Sun Alliance forwarding a copy of Sol's answer to the complaint that had been filed by Sun Alliance in the Superior Court action consigning $125,000 in settlement monies which the Court distributed to Sol on June 1, 1983 (Count 24).

We find the first two mailings, on which Counts 22 and 23 were based, unquestionably to have been in furtherance of the

---

**2.** Appellant also points to the government's alleged post-trial admission that there were two

Gonzalez contracts. We address this argument separately *infra* in Section III.

illegal scheme. This is not a case like *United States v. Castile*, 795 F.2d 1273 (6th Cir.1986), in which the mailings were part of the organization of an insurance company's investigatory effort to avoid payment, *see id.* at 1278–81, and the court found the "in furtherance" requirement not to have been met. Rather, the letters here, by recommending a settlement to Sun Alliance and by seeking documents needed for the settlement to proceed, clearly furthered the efforts of the cultivators of the scheme to taste the fruits of their labors.

The third mailing, however, stands on a different ground, in large part because it was made after the cultivators had enjoyed the fruits of the scheme and in no way furthered the execution of that scheme as conceived by the principal, Ortiz–Colon. It is true that Sol's answer to Sun Alliance's consignment or interpleader complaint advanced the scheme, in that its filing on June 1, 1983 enabled Ortiz–Colon to collect the $125,000 through the Superior Court. But that goal was achieved virtually simultaneously with the filing of the answer, when the Superior Court entered judgment the same day permitting Ortiz–Colon to withdraw the monies.

Acosta's mailing of a copy of the answer to Sun Alliance nearly three months later was wholly irrelevant to the scheme. From all that appears, the mailing was principally designed to complete the file for closing. To the degree that an active interest by the victim Sun Alliance can be inferred, the mailing was in opposition to the scheme because it suggests that Sun Alliance sought to examine Sol's answer in order to try to retrieve the money from Ortiz–Colon or answer the complaints of competing claimants. Such an effort served no purpose of the scheme and could only increase the possibility that the scheme would unravel.

A mail fraud conviction may not rest on a mailing of this sort. In *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the Supreme Court reversed a mail fraud conviction based on two interbank mailings that took place after the defendants received the money. The Court explained:

> The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.

*Id.* at 94, 65 S.Ct. at 150 (footnote omitted). Similarly, in *Maze*, the Court ruled that mailings that occurred after the victims' money had been obtained were not "sufficiently closely related to respondent's scheme to bring his conduct within the statute" because the mailings "increased the probability that respondent would be detected and apprehended." 414 U.S. at 399, 403, 94 S.Ct. at 650 (footnote omitted).

Of course, "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator." *Schmuck v. United States*, —— U.S. ——, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989).

Here, the mailings in Counts 22 and 23 were closely related to—indeed, necessary for executing—the purposes of the scheme. The mailing in Count 24—to the degree it retained any vitality after the fruition of the scheme to separate Sun Alliance and the Superior Court in Bayamon from the settlement money—was no part of the planned execution of the scheme and appeared only to enhance the prospects that the scheme would be uncovered. Consequently, we will affirm appellant's conviction on Counts 22 and 23 but reverse his conviction on Count 24.

### III

■ The alleged failure to provide exculpatory evidence concerns discrepancies regarding the date of the blank contract that Antonio Gonzalez testified he signed. At

trial, Gonzalez testified that the contract he signed at appellant's request was dated December 28, 1982 and marked "Lot 106–83." However, in a post-trial declaration, Rafael A. Martinez, the Bureau of Alcohol, Tobacco and Firearms agent who had been in charge of this case, referred to the contract as "number 106–83 ... dated December 28, *1983.*" (emphasis added). Appellant asserts that he is entitled to a new trial because of the government's failure to produce a 1983 contract.[3]

■ Appellant failed to raise this claim before the District Court although the opportunity presented itself. On June 7, 1988, appellant asked the District Court to set aside the verdict and dismiss the indictment. Agent Martinez's post-trial declaration was appended to the government's response, filed on July 27. After appellant's motion was denied on July 28, appellant on August 30 requested a clarification of Judge Cerezo's Order, but made no mention of the alleged discrepancy in the date of contract "106–83" as disclosed by the post-trial Martinez declaration. The motion for clarification was disposed of at appellant's sentencing on September 1. Thus, appellant had the opportunity to bring the alleged 198*3* contract to the attention of Judge Cerezo in both his August 30 motion and at the September 1 hearing. Having failed to raise the issue below, he cannot do so now before this court. "It has long been the practice in this circuit that an issue not presented in the district court will not be addressed for the first time on appeal." *United States v. Curzi,* 867 F.2d 36, 44 (1st Cir.1989); *see also United States v. Figueroa,* 818 F.2d 1020, 1025 (1st Cir.1987); *United States v. Argentine,* 814 F.2d 783, 791 (1st Cir.1987).

## IV

Finally, appellant challenges the admission of his grand jury testimony on grounds that he was not given proper warnings before he testified. The Assistant United States Attorney who handled the case before the grand jury, at trial, and on appeal contends that he was not obligated to give these warnings.

The Supreme Court has explicitly held that grand jury witnesses are not *constitutionally* entitled to "target" or "potential defendant" warnings. *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977). *Washington* extended the earlier plurality view that full *Miranda* warnings are not required in the grand jury context. *United States v. Mandujano,* 425 U.S. 564, 580–81, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976). But the Supreme Court has declined to decide "whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses." *Washington,* 431 U.S. at 186, 97 S.Ct. at 1818; *see also Mandujano,* 425 U.S. at 582 n. 7, 96 S.Ct. at 1778 n. 7.

The United States Department of Justice, however, has continued to make warnings for targets[4] a required policy except in circumstances—not suggested here—where notice might jeopardize the investigation. "Notwithstanding the lack of a clear constitutional imperative, it is the internal policy of the Department [of Justice] that" targets of an investigation be given

---

3. With its appellate brief, the government has filed a new declaration by Agent Martinez, attesting that the 1983 date in the earlier declaration was a typographical error. This explanation appears plausible because no other evidence supports the unlikely existence of a second contract with the same lot number signed by the same person on the same month and day yet one year later. But we are not at liberty to consider the new declaration. It was not before the District Court for her determination. It can accordingly play no part in ours. Appellant has moved to strike the references to this material in the government's brief. That motion will be ALLOWED.

4. As defined by Department of Justice guidelines, a "'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." United States Attorneys' Manual 9–11.150. That is the definition which we employ here. There is no dispute—nor could there be—that Pacheco was a target when called before the grand jury two days prior to the handing up of the indictment.

certain warnings before they testify before the grand jury. United States Attorneys' Manual 9–11.150.[5] These warnings, which include notice of the right against self-incrimination and the right to consult with counsel outside the grand jury room, are generally appended to all grand jury subpoenas served on any target or subject of an investigation. "In addition, these 'warnings' should be given by the prosecutor on the record before the grand jury and the witness should be asked to affirm that the witness understands them." *Id.* Moreover, the Justice Department instructs U.S. Attorneys that "[a]lthough the [Supreme] Court in *Washington, supra,* held that 'targets' of the grand jury's investigation are entitled to no special warnings relative to their status as 'potential defendant[s],' the Department continues its longstanding internal practice to advise witnesses who are known 'targets' of the investigation that their conduct is being investigated for possible violation of federal criminal law." *Id.*

This court, before *Washington* and *Mandujano,* had expressed "considerable sympathy" with the approach "of giving at least notice that a witness need not testify if such would incriminate him." *United States v. Chevoor,* 526 F.2d 178, 181–82 (1st Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). More recently, in *United States v. Babb,* 807 F.2d 272 (1st Cir.1986), we assumed that *some* warning was constitutionally mandated, noting that the defendant there "received all the warnings required by the Constitution." *Id.* at 278. *See also United States v. Whitaker,* 619 F.2d 1142 (5th Cir.1980) (warnings the better practice).

The reasons why warnings are appropriate are obvious. They were forcefully stated in *Chevoor:*

> the conjunction of an assembled grand jury, a vigorous prosecutor, and ex parte

proceedings conducted in the absence of a lawyer counselling the witness gives rise to a kind of coerciveness suggesting the wisdom of giving at least notice that a witness need not testify if such would incriminate him.

526 F.2d at 182. The force of this reasoning is, of course, heightened when the witness is a "putative defendant" in the case the grand jury is considering.

Some circuits have been quite emphatic regarding the need for target warnings. The Second Circuit, pursuant to its supervisory powers, suppressed grand jury testimony as a sanction for a failure to follow the long-standing prosecutorial practice in that Circuit of providing warnings of target status to grand jury witnesses. *United States v. Jacobs,* 547 F.2d 772 (2d Cir. 1976), *cert. granted,* 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), *cert. dismissed,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978). The expressed concern in *Jacobs* was to ensure consistency in practice among prosecutorial agencies.[6] But it was clear that the court also viewed warnings to be the preferred policy.

Following *Jacobs,* the Third Circuit—in which there apparently was no long-standing policy regarding warnings—announced that

> the uniform practice of warning target witnesses before grand juries in the Second Circuit has much to commend it, and we endorse that practice. Thus in the future, United States Attorneys in the Third Circuit should not be surprised if, pursuant to our supervisory powers over the manner of conducting grand jury proceedings, we were to follow *United States v. Jacobs* [by suppressing testimony elicited from targets without warnings].

---

**5.** Our reference to the U.S. Attorneys' Manual is to the October 1988 revision, which reflects in all respects material to this case the Department policy applicable when Pacheco appeared before the grand jury in November 1987. The relevant provisions of the Manual are set forth in the Appendix to this opinion.

**6.** Subsequent cases from the Second Circuit have treated *Jacobs* as simply an effort to alert the government to the need for consistency. *See, e.g., United States v. Nakashian,* 635 F.Supp. 761, 766 (S.D.N.Y.1986) *rev'd on other grounds,* 820 F.2d 549 (2d Cir.1989) *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987); *United States v. DePalma,* 461 F.Supp. 778, 792–93 (S.D.N.Y.1978).

*United States v. Crocker*, 568 F.2d 1049, 1056 (3d Cir.1977).

▮ Yet despite this consistent recognition by both the courts and the Department of Justice of the wisdom of target warnings, Assistant United States Attorney Medina failed to give appellant any warnings on the record.[7]

▮ We must determine, then, what, if any, sanction is appropriate. The *Jacobs* court, which imposed the most extreme sanction for the failure to follow Justice Department policy—that of suppressing the target's unwarned grand jury testimony and thereby effectively acquitting the defendant on the perjury charge arising out of that testimony—candidly recognized the uncomfortable choice which sanctionable prosecutorial misconduct presents. "[A]ny appellate court finds itself in a veritable dilemma when its choice is between vindicating a rule by sanction and allowing a possibly guilty person to escape." *Jacobs*, 547 F.2d at 775. In the past, extreme sanctions have been avoided after close analysis of the circumstances. Thus, in *Babb* we declined to suppress the evidence because certain warnings—although incomplete by Department of Justice standards—were given and it was "clear from the record that Babb did not incriminate himself—rather, he committed perjury, a separate crime which has never been held to be the substantive equivalent of self-incrimination." *Babb*, 807 F.2d at 277. Similarly,

in *Crocker*, the Third Circuit declined to suppress the testimony where the witness had been informed before his grand jury appearance that some persons had implicated him and he was "well aware of the penalties for false swearing." *Crocker*, 568 F.2d at 1056.

Here the circumstances are in one sense less egregious than they were in either *Babb* or *Crocker*. It does not appear that there was affirmative misrepresentation to Pacheco, as there was in *Babb* and *Crocker*, regarding target status; rather, there was an omission to inform Pacheco of his target status. Moreover, it appears that Pacheco's grand jury testimony was exculpatory in character, and dealt with the first warehouse fire, as to which he was acquitted on the substantive mail fraud counts. Although the government may have sought some incidental benefit by introducing grand jury testimony suggesting consciousness of guilt through a false exculpatory story, it is apparent that the government offered the testimony essentially to show false sworn statements. Even if the prosecutor's backhanded inquiry about whether Pacheco intended to assert his privilege against self-incrimination, *see* note 7 *supra*, were treated as an inadequate warning about his constitutional rights,[8] Pacheco cannot properly complain because the Fifth Amendment privilege does not provide a shield against perjury. *United States v. Wong*, 431 U.S. 174, 178–80, 97 S.Ct. 1823,

---

7. In his appellate brief, Mr. Medina, who represented the government in the grand jury and at trial, admits that *Miranda* and target "warnings were not given to defendant." Appellee's Brief at 24. Notwithstanding this written admission in his brief, Mr. Medina told us at oral argument that he had "asked Mr. Pacheco whether he intended to exercise his privilege not to incriminate himself and he said he was going to testify about everything that he knew." This backhanded oral suggestion of rights in an unrecorded pre-grand jury conference did not clearly apprise Mr. Pacheco of his target status, or his rights against self-incrimination for that matter. In any event, to the degree this reference to a suggestion of rights is intended to contradict the written admission that no advice of rights was given, we find both contradictory assertions beyond the record. We are accordingly not at liberty to consider them on the merits. *See supra* notes 1 and 3. For present

purposes, we note only that disputes about such matters can be minimized by careful prosecutors who put their warnings on the transcript record of a witness' grand jury testimony. Indeed, it is Department of Justice policy to prescribe such a use of the "record before the grand jury" to memorialize the advice of rights given targets or subjects of an investigation and the affirmation of such a witness that he or she understands them. United States Attorneys' Manual 9–11.150.

8. By contrast, in *Babb* the prosecutor delivered on the record before the grand jury a warning about the right to remain silent and elicited from Babb an acknowledgment of his understanding about that right. 807 F.2d at 275 n. 3. Apart from the misrepresentation about target status, it is apparent that the prosecutor in *Babb* observed Department of Justice policy regarding the advice of rights to grand jury witnesses.

1825–27, 52 L.Ed.2d 231 (1977). "[T]he failure of the witness to understand the privilege against self-incrimination will not require the subsequent suppression of the witness's concededly false statements." *Babb,* 807 F.2d at 276–77.

In *Babb* we noted this Circuit's longstanding policy that " '[o]ur supervisory powers are to be used sparingly. We would be reluctant to exercise them to overturn a conviction that was not the *product* of manifestly improper conduct by federal officials.' " *Id.* at 279 (emphasis supplied, citations omitted). Since *Babb* the Supreme Court has articulated clear limits on the exercise of judicial supervisory powers as a means for imposing preferred policies where there is no constitutional imperative. In *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), the Supreme Court placed in question whether supervisory authority over grand jury proceedings of the type employed in *Jacobs* and threatened in *Crocker* could be exercised without conducting a harmless error analysis. The Court in *Bank of Nova Scotia* held "that a federal court may not invoke supervisory power to circumvent the harmless error inquiry prescribed by Federal Rule of Criminal Procedure 52(a) [which] provides that '[a]ny error, defect irregularity or variance which does not affect substantial rights shall be disregarded.' " *Id.* 108 S.Ct. at 2374. Cf. *United States v. Hasting,* 461 U.S. 499, 506–07, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) (supervisory powers not to be used to vacate conviction when prosecutor's misconduct in closing argument, though reprehensible, was harmless); *United States v. Payner,* 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980)

(supervisory powers do not authorize suppression of otherwise admissible evidence on grounds that it was seized unlawfully from a third party not before the court); *United States v. Hastings,* 847 F.2d 920, 927–28 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988) (dismissal with prejudice under Speedy Trial Act for prosecutorial discovery violation not warranted in absence of causal nexus between trial delay and misconduct).

There has been no showing here that the decision to indict Pacheco was influenced in any manner by the failure to give warnings.[9] It is clear from our analysis of the record that Pacheco's conviction on the counts we have affirmed was not in any way the product of prosecutorial misconduct in failing to give target warnings. Accordingly, we do not believe suppression and a new trial would be an appropriate sanction in this case.

Nevertheless, we are left with the uneasy feeling that certain prosecutors feel free to ignore precatory judicial statements of concern about the failure to provide grand jury targets with warnings. It is apparent that even forceful characterizations of prosecutorial behavior will go unnoticed without repeated judicial prompting. Here, for example, Mr. Medina failed even to cite *Babb,* a case clearly on point, where we observed in rather arresting language that similar prosecutorial conduct was "more than 'quite troublesome;' we find it to be unprofessional and worthy of severe condemnation." *Babb* 807 F.2d at 279.[10]

■ We confront, then, the violation of a policy which does not justify a case-related

---

**9.** It bears noting that frequently targets actually seek out the opportunity to bring their case directly to the grand jury by testifying. Department of Justice guidelines urge accommodation of such requests. "[U]nder normal circumstances, where no burden on the grand jury or delay of its proceedings is involved, reasonable requests by a 'subject' or 'target' of an investigation ... personally to testify before the grand jury ordinarily should be given favorable consideration, provided that such witness explicitly waives his/her privilege against self-incrimination and is represented by counsel or voluntarily and knowingly appears without counsel and

consents to full examination under oath." U.S. Attorneys' Manual 9–11.152. Here Pacheco, although inadequately warned before his grand jury appearance, was apparently anxious to tell his story. He even ended his grand jury appearance with a request: "Please, if you have any questions, I'm available."

**10.** No doubt the ignorance of the prosecutor here regarding our views about such misconduct was made easier by the failure of the defendant to refer to *Babb* in his brief.

judicial sanction and yet which appears immune to expressions of judicial dissatisfaction. We believe it appropriate to give notice that in the future we may pursue another—previously untravelled—avenue to secure enforcement of the better prosecutorial practice and reprimand of those who fail to observe it.

The "internal policies" of the Department of Justice now articulated in the U.S. Attorneys' Manual regarding warnings to targets called before the grand jury strike us as sound. So long as they are observed, we see no purpose in separately articulating guidelines under our supervisory powers for this aspect of grand jury practice. We assume that these policies are meant to be enforced and will be, if violations are brought to the attention of the appropriate persons. The Department of Justice maintains an Office of Professional Responsibility whose mission it is to "[r]eceive and review any information or allegation concerning conduct by a Department employee that may be in violation of law, regulations or orders, or of applicable standards of conduct." 28 C.F.R. § 0.39a(a). In appropriate circumstances, we will consider whether to refer future violations of the Department's internal policies regarding grand jury target warnings which come to our attention on appeal to that Office for a report concerning the steps the Department proposes to take to police its internal policy guidelines and to discipline those of its employees who choose not to follow them. The response of the Office of Professional Responsibility will be made a part of the public record in each such appeal. In this way, the court and the public may be apprised how the internal policies of the Department are enforced by the agency that promulgated them. We trust the prospect of such enforcement will prove an

adequate deterrent to those Department of Justice employees who might contemplate conduct in violation of those policies.[11]

## V

In conclusion: we are bound to consider on the merits only those factual materials presented to the District Court and thus strike references to matters outside the record before the District Court. *See* note 3 *supra.* On the merits, we find that appellant correctly charges the government with misconduct in its prosecution of this case through its failure to give appropriate warnings to him as a target called upon to appear before the grand jury. We hold, however, that Mr. Pacheco was not harmed by this misconduct in a way that warrants action adverse to the judgment on appeal; and we therefore affirm his conviction on those three counts for which there was sufficient evidence. We reverse the conviction on one count, which concerned a mailing that did not further the illegal scheme alleged.

The Appellant's "Motion to Strike" is *Allowed.*

The judgment is:

*Affirmed* as to Counts 1, 22, and 23.

*Reversed* as to Count 24.

### APPENDIX

### UNITED STATES ATTORNEYS' MANUAL

9–11.150 *Advice of "Rights" of Grand Jury Witnesses*

It is the Department's policy to advise a grand jury witness of the rights described below only if such witness is a "target" or "subject" (as hereinafter defined) of a grand jury investigation.

**11.** This remedy is designed in light of the directions provided by the Supreme Court in *Bank of Nova Scotia,* 108 S.Ct. at 2378, to focus upon the responsible individual—the errant prosecutor. It is also designed to place enforcement responsibility with the accountable agency—the Department of Justice. Of course, we will review carefully the Department's responses to any referrals. And should these responses indicate that—to adopt a phrase from a former

United States Attorney General—the Department's internal policy in the area exists only as "a promise to the ear to be broken to the hope, a teasing illusion like a munificent bequest in a pauper's will," *Edwards v. California,* 314 U.S. 160, 186, 62 S.Ct. 164, 172, 86 L.Ed. 119 (1941) (Jackson, J., concurring), we will consider what other disciplinary enforcement procedures are appropriate to secure sound prosecutorial practice before the grand juries of this Circuit.

The Supreme Court declined to decide whether a grand jury witness must be warned of his/her Fifth Amendment privilege against compulsory self-incrimination before his/her grand jury testimony can be used against the witness. *See United States v. Washington,* 431 U.S. 181, 186 and 190–191 (1977); *United States v. Wong,* 431 U.S. 174 (1977); *Mandujano, supra,* at 582 n. 7. It is important to note, however, that in *Mandujano* the Court took cognizance of the fact that federal prosecutors customarily warn "targets" of their Fifth Amendment rights before grand jury questioning begins. Similarly, in *Washington* the Court pointed to the fact that Fifth Amendment warnings were administered as negating "any possible compulsion to self-incrimination which might otherwise exist" in the grand jury setting. *See Washington, supra,* at 188.

Notwithstanding the lack of a clear constitutional imperative, it is the internal policy of the Department that an "Advice of Rights" form, as set forth below, be appended to all grand jury subpoenas to be served on any "target" or "subject" (as hereinafter defined) of an investigation:

### Advice of Rights

A. The grand jury is conducting an investigation of possible violations of federal criminal laws involving: (State here the general subject matter of inquiry, *e.g.,* the conducting of an illegal gambling business in violation of 18 U.S.C. § 1955).

B. You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

C. Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding.

D. If you have retained counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you do so desire.

In addition, these "warnings" should be given by the prosecutor on the record before the grand jury and the witness should be asked to affirm that the witness understands them.

A "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. An officer or employee of an organization which is a target is not automatically to be considered as a target even if such officer's or employee's conduct contributed to the commission of the crime by the target organization, and the same lack of automatic target status holds true for organizations which employ, or employed, an officer or employee who is a target. Although the Court in *Washington, supra,* held that "targets" of the grand jury's investigation are entitled to no special warnings relative to their status as "potential defendant[s]", the Department continues its longstanding internal practice to advise witnesses who are known "targets" of the investigation that their conduct is being investigated for possible violation of federal criminal law. This supplemental "warning" will be administered on the record when the target witness is advised of the matters discussed in the preceding paragraphs.

A "subject" of an investigation is a person whose conduct is within the scope of the grand jury's investigation.

Where a local district court insists that the notice of rights may not be appended to a grand jury subpoena, the advice of rights may be set forth in a separate letter and mailed to or handed to the witness when the subpoena is served.

9–11.151 Subpoenaing Targets of the Investigation

A grand jury may properly subpoena a subject or a target of the investigation and question him/her about his/her involvement in the crime under investigation. *See Wong, supra,* at 179 n. 8; *Washington, supra,* at 190 n. 6; *Mandujano, supra,* at 573–75 and 584 n. 9; *United States v. Dionisio,* 410 U.S. 1, 10 n. 8 (1973). However, in the context of particular cases such a subpoena may carry the appearance of unfairness. Because the potential for mis-

understanding is great, before a known "target" (as defined in USAM 9–11.150, *supra*) is subpoenaed to testify before the grand jury about his/her involvement in the crime under investigation, an effort should be made to secure his/her voluntary appearance. If a voluntary appearance cannot be obtained, he/she should be subpoenaed only after the grand jury and U.S. Attorney or the responsible Assistant Attorney General have approved the subpoena. In determining whether to approve a subpoena for a "target," careful attention will be paid to the following considerations:

A. The importance to the successful conduct of the grand jury's investigation of the testimony or other information sought;

B. Whether the substance of the testimony or other information sought could be provided by other witnesses; and

C. Whether the questions the prosecutor and the grand jurors intend to ask or the other information sought would be protected by a valid claim of privilege.

9–11.152 Requests by Subjects and Targets to Testify Before the Grand Jury

It is not altogether uncommon for subjects or targets of the grand jury's investigation, particularly in white-collar cases, to request or demand the opportunity to tell the grand jury their side of the story. While the prosecutor has no legal obligation to permit such witnesses to testify *United States v. Leverage Funding System, Inc.*, 637 F.2d 645 (9th Cir.1980), *cert. denied*, 452 U.S. 961 (1981); *United States v. Gardner*, 516 F.2d 334 (7th Cir.1975), *cert. denied*, 423 U.S. 861 (1976) a refusal to do so can create the appearance of unfairness. Accordingly, under normal circumstances, where no burden upon the grand jury or delay of its proceedings is involved, reasonable requests by a "subject" or "target" of an investigation (as defined in USAM 9–11.150, *supra*) personally to testify before the grand jury ordinarily should be given favorable consideration, provided that such witness explicitly waives his/her privilege against self-incrimination and is represented by counsel or voluntarily and knowingly appears without counsel and consents to full examination under oath.

Some such witnesses undoubtedly will wish to supplement their testimony with the testimony of others. The decision whether to accommodate such requests, reject them after listening to the testimony of the target or the subject, or to seek statements from the suggested witnesses is a matter which is left to the sound discretion of the grand jury. When passing on such requests, it must be kept in mind that the grand jury was never intended to be and is not properly either an adversary proceeding or the arbiter of guilt or innocence. *See, e.g., Calandra, supra*, at 343.

9–11.153 Notification of Targets

Where a target is not called to testify pursuant to USAM 9–11.151, *supra*, and does not request to testify on his/her own motion (*see* USAM 9–11.152, *supra*), the prosecutor, in appropriate cases, is encouraged to notify such person a reasonable time before seeking an indictment in order to afford him/her an opportunity to testify (subject to the conditions set forth in USAM 9–11.152, *supra*) before the grand jury. Of course, notification would not be appropriate in routine clear cases nor where such action might jeopardize the investigation or prosecution because of the likelihood of flight, destruction or fabrication of evidence, endangerment of other witnesses, undue delay or otherwise would be inconsistent with the ends of justice.