White v. Union Leader Corp.          CV-00-122-B   07/13/01
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


Stacey White


     v.                                    Civil No. 00-122-B
                                           Opinion No. 2001 DNH 126
Union Leader Corporation, et al.



                      MEMORANDUM AND ORDER

     Stacey White pro se brings this action against four

employees of the Union Leader Corporation, her former employer,

and against Union Leader's legal counsel.  She alleges that the

defendants engaged in a scheme to defraud newspaper carriers of

their earnings.  Based on this conduct, White asserts claims

under the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961 et seq.[1]  I have before me motions to

dismiss filed by: (1) Michael Rhodes, Dee Jones, Guy Bilodeau,

and Douglas Pepin, (Doc. No. 23); and (2) the law firm of Malloy

& Sullivan and Attorney Gregory Sullivan, (Doc. No. 21).  For the

reasons discussed herein, I grant these motions insofar as they

_____

     [1]  White also asserts state law claims against these
defendants.  I decline to reach the merits of these claims in
this Memorandum and Order.

apply to White's RICO claims.

## I.  **BACKGROUND**[2]

The Union Leader Corporation ("Union Leader") publishes two newspapers, The Union Leader and New Hampshire Sunday News. Stacey White worked as a newspaper carrier for Union Leader from September 29, 1997 to December 27, 1998.  White signed a Newspaper Distribution Delivery Agreement (the "Delivery Agreement") with Union Leader in which she agreed to purchase newspapers from Union Leader and deliver them to subscribers in the Manchester, New Hampshire area.  Union Leader's legal counsel, the law firm of Malloy & Sullivan, drafted the Delivery Agreement.

Subscribers paid either White or the Union Leader for the newspapers that she delivered.  Union Leader required White to place any funds that she received from subscribers into an account maintained for her by Union Leader.  Union Leader maintained records of the number of newspapers that White

---

[2]  The background facts set forth in this Memorandum and Order are taken from White's First Amended Complaint ("Cplt."), (Doc. No. 6).

-2-

purchased, as well as payments made by subscribers on White's delivery route. Union Leader paid White a percentage of the money received from subscribers.

White also maintained records detailing the number of papers that she delivered and the payments that she received from Union Leader. She soon began to notice a number of discrepancies between her calculations and the payments that she received from Union Leader. She alleges, for example, that Union Leader: (1) failed to properly credit her account for payments and tips received; (2) required her to purchase and deliver newspapers to individuals who had either canceled their subscriptions and/or refused to pay for their subscriptions, thereby subjecting White to potential financial loss; (3) failed to properly credit her account for newspapers that she delivered while she was being trained; (4) improperly credited the account of a prior carrier on her route for newspapers that White had delivered; (5) charged her for newspaper bags that she had been told would be given to her for free; and (6) placed funds received from subscribers on her route in an interest-bearing account but refused to pay that interest to her.

White brought these discrepancies to the attention of Douglas Pepin, the area manager for her delivery route. While Pepin agreed to reimburse her for some of the disputed transactions, he declined her request for reimbursement as to other transactions.

In addition, White began to suggest numerous changes to Union Leader's accounting and delivery policies. White offered these suggestions to Pepin and other Union Leader supervisors and employees, including Dee Jones, Guy Bilodeau, and Michael Rhodes. She also shared her concerns with other newspaper carriers.

Pepin, Jones, Bilodeau, and Rhodes informed White that Union Leader had no intention of changing its accounting and delivery policies and that White's only duty was to deliver newspapers. They soon became annoyed by White's numerous complaints and suggestions, and they threatened to terminate White's contract with Union Leader if she continued to challenge Union Leader's policies and practices. Pepin terminated White's contract on December 27, 1998.

At a time not specified in the record, White initiated litigation in New Hampshire Superior Court against Union Leader

to obtain records pertaining to her delivery route and the account maintained on her behalf by Union Leader. The Superior Court held at least two hearings on the matter. White alleges that, during a hearing on March 17, 1999, Gregory Sullivan, a partner at Malloy & Sullivan, made the following misrepresentations: (1) that Union Leader had introduced testimony at a prior hearing that White "had been creating problems for them," when, in fact, no such testimony had been introduced; and (2) that a certain statement was made by a newspaper carrier, when, in fact, it had been made by a Union Leader employee. Subsequently, the Superior Court dismissed White's litigation, for reasons not disclosed in the record.

White initiated this litigation on March 17, 2000. After conducting a preliminary review of White's amended complaint, Magistrate Judge Muirhead issued a Report and Recommendation, (Doc. No. 7), on October 27, 2000 in which he recommended that certain counts in the complaint should be dismissed. After White filed a motion to reconsider, Magistrate Judge Muirhead issued an Order, (Doc. No. 10), on November 20, 2000, amending his Report and Recommendation. I approved the Magistrate's Report and

Recommendation, as amended, on November 28, 2000.


## II. <u>STANDARD OF REVIEW</u>

A motion to dismiss based on Fed. R. Civ. P. 12(b)(6) requires the court to accept the well-pleaded facts of the complaint as true and to draw all reasonable inferences in favor of the plaintiff. <u>See</u> <u>Aybar v. Crispin-Reyes</u>, 118 F.3d 10, 13 (1st Cir. 1997); <u>Washington Legal Found. v. Massachusetts Bar Found.</u>, 993 F.2d 962, 971 (1st Cir. 1993). I may dismiss the complaint only if, when viewed in this manner, it appears beyond doubt that the plaintiff can prove no set of facts that would entitle her to relief. <u>See</u> <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 514 (1st Cir. 1988).

The threshold for stating a claim under the federal rules "may be low, but it is real." <u>Id.</u> While I must construe all well-pleaded facts in the plaintiff's favor, I need not accept a plaintiff's "unsupported conclusions or interpretations of law." <u>Washington Legal Found.</u>, 993 F.2d at 971.

<u>Pro</u> <u>se</u> pleadings are held to a less stringent standard than those drafted by lawyers and are to be liberally construed in

favor of the pro se party.  See Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997).

In civil RICO cases, which necessarily involve allegations of criminal conduct, "particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants." Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991).  The First Circuit has recognized that "[c]ivil RICO is an unusually potent weapon-- the litigation equivalent of a thermonuclear device.  The very pendency of a RICO suit can be stigmatizing and its consummation can be costly." Id.  For these reasons, the First Circuit has advised that "courts should strive to flush out frivolous [civil] RICO allegations at an early stage of the litigation." Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir. 1990).

I apply this standard in reviewing the defendants' motions to dismiss.

## III.  DISCUSSION

White asserts civil RICO claims against Rhodes, Jones, Bilodeau, Pepin (collectively referred to as the "Union Leader Employees"), Malloy & Sullivan, and Gregory Sullivan.  Defendants

move to dismiss these claims.  For the reasons discussed below, I grant their requests.

## A.    Civil RICO Claims Against the Union Leader Employees

White claims that Rhodes, Jones, Bilodeau, and Pepin are liable under Section 1962(c) of the civil RICO statute because they conducted, or participated in the conduct of, Union Leader through a pattern of mail fraud and extortion.[3]  See 18 U.S.C. § 1962(c) (2001).

Section 1962(c) provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Id.  To be liable under Section 1962(c), a person must (1) "conduct or participate . . . in the conduct" of (2) an "enterprise"[4] (3)

_____

[3]  I dismissed White's other Section 1962(c) claims when I approved the Magistrate's Report and Recommendation.

[4]  The statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961 (4).  White identifies Union Leader as the enterprise at issue here.

-8-

through a "pattern"[5] (4) of "racketeering activity."[6]  Id.; see

Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)

(identifying the elements of a Section 1962(c) claim); Camelio v.

American Federation, 137 F.3d 666, 669-70 (1st Cir. 1998).  In

addition, to have standing to bring a Section 1962(c) claim, a

plaintiff must plead, and ultimately prove, that she suffered an

injury to business or property as a result of the defendants'

racketeering activities.  See 18 U.S.C. § 1962(c); Sedima, 473

U.S. at 495-97; Camelio, 137 F.3d at 669-70.

In their motion to dismiss, the Union Leader Employees argue

that White's civil RICO claims against them fail for a number of

reasons.  Although I agree with the Union Leader Employees that

these claims are deficient in many respects, I begin my analysis

---

[5]  The statute defines "pattern of racketeering activity" to
mean at least two predicate acts of racketeering activity, the
second of which must have occurred within ten years of the first.
18 U.S.C. § 1961(5).  The First Circuit has held that "a
plaintiff seeking to establish a RICO 'pattern' must show that
the predicate acts are related *and* that they amount to or pose
the threat of continued criminal activity."  Ahmed, 118 F.3d at
889 (emphasis in original).

[6]  "Racketeering activity" includes any act which is
indictable under any one or more of certain specified laws,
including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1951
(extortion).  See 18 U.S.C. § 1961(1) (listing predicate acts of
racketeering activity).

by discussing a significant issue which was not raised in their motion to dismiss.

### 1. "Distinctness"

"[I]t is well settled in this circuit that the 'person[s]' identified under § 1962(c) must be distinct from the 'enterprise.'" Bessette v. Avco Financial Servs., Inc., 230 F.3d 439, 448 (1st Cir. 2000), cert. denied, 121 S.Ct. 2016 (2001) (citations omitted). In this case, White alleges that the Union Leader Employees participated in the conduct of Union Leader, the alleged enterprise, through a pattern of extortion and mail fraud. "The problem with this formulation of [her] claim is that employees acting solely in the interest of their employer, carrying on the regular affairs of the corporate enterprise, are not distinct from that enterprise." Id. at 449.

Even when construed generously and in the light most favorable to White, her amended complaint contains no allegations which would tend to suggest that the Union Leader Employees were doing anything other than "carrying on the regular affairs" of Union Leader. See id. at 449. The Union Leader Employees simply enforced the rules and requirements set forth by Union Leader with regard to newspaper carriers, such as ensuring that

newspapers were distributed in a certain manner, and that carriers received only those funds to which they were entitled. See, e.g., Cplt. ¶¶ 44 (issuing invoices to newspaper carriers), 49 (explaining Union Leader billing policies), 51 (crediting White's account for subscriptions paid), 54 (transferring money into White's account), 61-62 (enforcing Union Leader policy with regard to delivery of newspapers), 72 (enforcing Union Leader policy with regard to overpayments); see also, e.g., id. ¶ 60 ("Whenever there was an issue, [White] discussed it with Mr. Pepin and he simply stated, 'it is Union Leader policy.'"). Indeed, White admits as much in her response to the Union Leader Employees' motion to dismiss. See Pl.'s Mem. of Law in Opposition to Union Leader Employees' Mot. to Dismiss, (Doc. No. 25), at 8 ("plaintiff does not dispute counsel's perception that these acts [of the Union Leader Employees] are routine Union Leader business transactions"). Because White does not allege that the Union Leader Employees "were associated in any manner apart from the activities of the enterprise," i.e., Union Leader, she fails to state a Section 1962(c) claim. Bessette, 230 F.3d at 449.

Although this deficiency is sufficient to defeat White's

Section 1962(c) claim, I also address two of the other arguments raised by the Union Leader Employees. Specifically, the Union Leader Employees contend that White fails to: (1) plead the predicate acts of mail fraud with the requisite particularity; and (2) set forth facts which, even if true, would establish that they engaged in a pattern of extortion. As discussed below, I agree.

## 2. **Mail Fraud**[7]

In the First Circuit, a civil RICO plaintiff must plead predicate acts of mail fraud with particularity, in accordance with Federal Rule of Civil Procedure 9(b). See Ahmed, 118 F.3d at 889; Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42-43 (1st Cir. 1991); New England Data Servs., Inc. v. Becher, 829 F.2d 286, 290-91 (1st Cir. 1987). Accordingly, a plaintiff must "state the time, place and content of the alleged mail . . .

_____

[7] A violation of the federal mail fraud statute requires: (1) the defendants' knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud; and (2) the use of the mails in furtherance of the scheme. See 18 U.S.C. § 1341 (2001); United States v. Ruiz, 105 F.3d 1492, 1501 (1st Cir. 1997); see also United States v. Pacheco-Ortiz, 889 F.2d 301, 305-07 (1st Cir. 1989) (discussing when a mailing can be considered to be "in furtherance of" a scheme or artifice to defraud).

communications perpetrating that fraud." Ahmed, 118 F.3d at 889; see Feinstein, 942 F.2d at 42. Where a plaintiff claims that multiple defendants committed mail fraud, she must make particularized allegations against each individual defendant. See, e.g., Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 79 (D. Mass. 1998) (mail fraud); Shields v. Amoskeag Bank Shares, Inc., 766 F. Supp. 32, 40 (D.N.H. 1991) (securities fraud); see generally James Wm. Moore, et al., 2 Moore's Federal Practice § 9.03[1][f] (3d ed. 2001) ("If a claim involves multiple defending parties, a claimant usually may not group all wrongdoers together in a single set of allegations. Rather, the claimant is required to make specific and separate allegations against each defendant.")

White's allegations fail to satisfy Rule 9(b)'s particularity requirement. In Paragraph 278, White alleges that "Union Leader and defendants, named or unnamed, have advertised through the mail soliciting for carriers/distributors(intended victims)" on February 25, 2000 and in May, 1999. Cplt. ¶ 278. She fails to specify, however, which of the Union Leader Employees solicited for carriers, the location from which those solicitations were mailed, or the specific content of those

solicitations.

In Paragraph 279, White alleges that "Union Leader and defendants have regularly solicited for subscribers through the mail in furtherance of the scheme . . . on a weekly basis for approximately two years." Id. ¶ 279. White fails to specify which Union Leader Employees solicited subscribers, the location from which those solicitations were mailed, the specific content of those solicitations, or when those solicitations were mailed.

In Paragraph 280, White alleges that "Union Leader and defendants have knowingly received money through the mail from subscribers" on a regular basis. Id. ¶ 280. At various points in her amended complaint, White suggests that Pepin may have received some of this money from subscribers. See, e.g., id. ¶¶ 44, 63. White, however, fails to specify when and where Pepin received this money.

Because White's allegations of mail fraud are not pleaded with particularity, her complaint as currently presented fails to state any predicate acts of mail fraud.

Where, as here, a plaintiff fails to plead mail fraud with the particularity required by Rule 9(b), I must determine "whether further discovery is warranted and, if so, the plaintiff

-14-

should be provided with the opportunity to amend the complaint after the completion of this discovery." Ahmed, 118 F.3d at 890; see Becher, 829 F.2d at 290-92. A plaintiff is not, however, automatically entitled to such discovery and the opportunity to amend. See Ahmed, 118 F.3d at 890; Feinstein, 942 F.2d at 44. For example, when a plaintiff "fail[s] to supply specific allegations which would indicate that critical information was in the sole possession of the defendants," he or she may not be entitled to discovery or the opportunity to amend. Ahmed, 118 F.3d at 890. Moreover, the First Circuit has stated that "[i]n a RICO action where fraud has not been pleaded against a given respondent with the requisite specificity and Rule 9(b) has been flouted, dismissal should follow as to that respondent unless the plaintiff, at a bare minimum, suggests to the district court, in a timely manner, that a limited period of discovery will likely allow him to plug the holes in the complaint and requests leave (i) to conduct discovery for this limited purpose and (ii) thereafter to amend his complaint. It is only then that a district court must take a second look to ascertain whether a particular case is 'appropriate' for the special unguent of deferral." Feinstein, 942 F.2d at 44 (internal citation

omitted).

White kept records of her interactions with Union Leader and the Union Leader Employees. As a result, her one hundred and fifty-nine page, four hundred and ninety-one paragraph, amended complaint contains detailed information about disputes that arose concerning individual transactions. See, e.g., Cplt. ¶¶ 44, 52, 54, 59, 72, 74. Moreover, White has had the opportunity to review numerous Union Leader invoices which contain information related to her mail fraud claims. Despite her first hand knowledge of many of the alleged mailings, and her access to these invoices, she has been unable to plead predicate acts of mail fraud against the individual Union Leader Employees with the requisite specificity. See Feinstein, 942 F.2d at 42 n.9; Becher, 829 F.2d at 291-92 (stating that a court should consider "whether the communications were between the defendants solely or between the defendants and the plaintiff . . . [when determining] whether the facts were peculiarly within the defendants' control"). Indeed, she offers little more than her own bald assertions to support her claim that the Union Leader Employees were even involved in the alleged acts of mail fraud. See Ahmed, 118 F.3d at 889. Therefore, I conclude that any additional

discovery on the issue would be futile.

Because White has failed to plead mail fraud with particularity, she has not alleged any viable predicate acts of mail fraud. Further, White is not entitled to an opportunity to conduct limited discovery or to further amend her complaint to remedy this failing.

### 3. **Extortion under the Hobbs Act**

The Hobbs Act imposes criminal penalties on any person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a) (2001). For all purposes relevant to this action, the Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." Id. § 1951(b)(2). Fear of economic loss, generally called "economic fear," is included within the meaning of the statutory term "fear." See, e.g., United States v. Hathaway, 534 F.2d 386, 394 (1st Cir. 1976).

White alleges that the Union Leader Employees violated the Hobbs Act by threatening to terminate her contract if she did not comply with the Union Leader's policy that all carriers must pay

-17-

for and deliver newspapers in advance of payment from subscribers, and after subscriptions had lapsed or been canceled.[8]  See, e.g., Cplt. ¶¶ 247, 249-57, 259, 261-65, 270-73. She contends that this constituted extortion because it exposed her to potential financial loss if the newspaper recipients refused to pay.  In essence, White argues that the Union Leader Employees extorted her through the wrongful use of fear of the economic harm that she would suffer if they terminated her contract.

It is not always extortion for a party to a business agreement to use the threat of economic harm to persuade another party to that agreement to abide by its terms.  See, e.g., United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989) (holding that "for purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property" (footnotes omitted)); United

_____

[8]  In addition, White alleges that the Union Leader Employees failed to reimburse her for funds that they received from subscribers on her delivery route.  Because White does not allege that she gave the Union Leader Employees her consent to withhold these funds from her, these allegations are not viable as extortion claims under the Hobbs Act.  See 18 U.S.C. § 1951(b)(2) (defining extortion); Camelio, 137 F.3d at 671 (noting that unilateral acts are not extortion).

States v. Kattar, 840 F.2d 118, 123 (1st Cir. 1988). Thus, if one party feels that the other has breached the agreement between them, she may threaten to refuse to abide by her own contractual obligations or threaten to sue for breach of contract. See Kattar, 840 F.2d at 123.

In this case, White agreed to abide by Union Leader's policies and procedures. When she later expressed her unwillingness to do so, the Union Leader Employees warned White that they might terminate her newspaper carrier contract. This is simply not the wrongful use of economic fear prohibited by the Hobbs Act. See Sturm, 870 F.2d at 773; Kattar, 840 F.2d at 123; see also Miranda, 948 F.2d at 49 (observing that RICO cannot be used as a "panacea to redress every instance" of wrongdoing). Accordingly, White has not alleged facts which would constitute the RICO predicate act of extortion.

Ultimately, although White may have suffered financial loss as a result of the actions of Union Leader and its employees, she fails to adequately allege that those losses were caused by any RICO predicate acts. See Sedima, 473 at 495-97; Camelio, 137 F.3d at 669-70; see also Beck v. Prupis, 529 U.S. 494, 505 (2000) (holding that an "injury caused by an overt act that is not an

act of racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)"). Moreover, she has failed to show that the Union Leader Employees are distinct from Union Leader. See Bessette, 230 F.3d at 448-49. Accordingly, I grant the Union Leader Employees' motion to dismiss the civil RICO claims against them.

**B.     Civil RICO Claims Against Union Leader's Legal Counsel**

White contends that Union Leader's legal counsel, the law firm of Malloy & Sullivan and Attorney Gregory Sullivan, violated Section 1962(d) of the RICO statute by conspiring with the Union Leader Employees to violate Section 1962(c). See 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate [§ 1962(c)]"). White alleges that Malloy & Sullivan and Attorney Sullivan agreed to facilitate the Union Leader Employees' ongoing scheme to defraud newspaper carriers of their earnings. See Cplt. ¶ 446. She alleges that Attorney Sullivan and Malloy & Sullivan furthered this conspiracy by: (1) drafting the Delivery Agreement; and (2) making misrepresentations while defending Union Leader in the state court proceedings initiated by White. See id. ¶¶ 15, 131, 446. Attorney Sullivan and Malloy

& Sullivan move to dismiss these claims.

In order to state a claim for RICO conspiracy under Section 1962(d), a plaintiff must show that the conspirators agreed to facilitate or "further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense." Salinas v. United States, 522 U.S. 52, 65 (1997); see, e.g., Goren v. New Vision Int'l, Inc., 156 F.3d 721, 732 (7th Cir. 1998). Thus, where a plaintiff's "pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails." Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 21 (1st Cir. 2000), cert. denied, 121 S. Ct. 1228 (2001); see also Miranda, 948 F.2d at 48 ("An actionable claim under section 1962(d), like one under section 1962(c), requires that the complainant's injury stem from a [RICO] predicate act").

White's conspiracy claim is predicated on the existence of a pattern of racketeering activity conducted by the Union Leader Employees. Because I have already concluded that White fails to state a substantive RICO claim against the Union Leader Employees, I also dismiss the conspiracy claims against Attorney Sullivan and Malloy & Sullivan. Efron, 223 F.3d at 21; see

-21-

<u>Salinas</u>, 522 U.S. at 65; <u>Miranda</u>, 948 F.2d at 48.


## IV.  <u>CONCLUSION</u>

For the reasons discussed herein, I grant the defendants' motions to dismiss, (Doc. Nos. 21, 23), the RICO claims against them.  No federal claims remain pending against these defendants.

SO ORDERED.


_____
Paul Barbadoro
Chief Judge


July     , 2001

cc:  Stacey White, <u>pro</u> <u>se</u>
     Donald A. Kennedy, Esq.
     Richard B. McNamara, Esq.
     Michael O'Shaughnessy, Esq.