## Commonwealth *vs.* Thomas A. Woods.

Plymouth. September 10, 2013. - January 2, 2014.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Homicide. Joint Enterprise. Evidence,* Joint enterprise, Intent, Motive, Consciousness of guilt, Testimony before grand jury, Voluntariness of statement. *Intent. Grand Jury. Constitutional Law,* Grand jury, Self-incrimination, Voluntariness of statement, Assistance of counsel. *Witness,* Self-incrimination. *Practice, Criminal,* Grand jury proceedings, Voluntariness of statement, Request for jury instructions, Assistance of counsel, Capital case. *Supreme Judicial Court,* Superintendence of inferior courts.

At a murder trial in which the Commonwealth proceeded on a theory of joint venture, the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to permit the jury to conclude beyond a reasonable doubt that the defendant, although not the shooter of the victim, participated in and shared the required intent to commit the crime. [712-716]

At a criminal trial, there was no error in the admission of a defendant's testimony before the grand jury, where he was not a target of the grand jury investigation when he was called to testify, and, even if he were, the Commonwealth was under no obligation to advise him of his right to avoid self-incrimination under the Fifth Amendment to the United States Constitution. [716-718]

This court announced a rule, to be applied prospectively, that where, at the time a witness appears to testify before a grand jury, the prosecutor has reason to believe that the witness is either a target of the grand jury investigation or likely to become one, the witness must be advised, before testifying, that he or she may refuse to answer any question if a truthful answer would tend to incriminate the witness, and that anything that he or she does say may be used against the witness in a subsequent legal proceeding. [718-720]

At a criminal trial, the judge did not err in declining to give a jury instruction concerning statements made by the defendant during an unrecorded police interview, where the defendant did not request such an instruction. [720-721]

Indictment found and returned in the Superior Court Department on October 5, 2006.

The case was tried before by *Paul E. Troy,* J.

*Myles Jacobson* for the defendant.

*Mary Lee,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning hours of December 2, 2005, the defendant, Thomas A. Woods, and the victim, Paul Mullen, left a nightclub and agreed to meet later to smoke marijuana. The defendant drove to the local Hess gasoline station located in the city of Brockton, which was a popular late-night meeting place. When the victim telephoned the defendant to ask where he was, the defendant told him he was at Hess, and the victim said he would be right there. Once the victim arrived, the defendant asked him to sit in the driver's side seat and roll a marijuana "blunt," while he went into the store to buy some pizza. While the defendant made idle conversation with the cashier inside the station, two masked men approached the vehicle and one shot the victim eight times, killing him almost instantly. The defendant went to the vehicle, laid the victim on the ground, and drove to his girl friend's house, where he was seen talking to a man similar in description to the shooter.[1] The defendant later gave two noncustodial interviews to police, and testified before the grand jury as a witness. After further investigation, he was indicted and tried for murder in the first degree. On May 20, 2009, the defendant was found guilty and sentenced to life in prison.

On appeal, the defendant argues that the evidence was insufficient to prove his guilt as a joint venturer. He contends that the Commonwealth's case, which relied almost entirely on circumstantial evidence, did not include any direct evidence that he knew the shooting was to take place. He further argues that the trial judge erred in finding that he was not a "target" of the investigation when he was called to testify before the grand jury, and that, because he was a "target," he was entitled to be advised of his right not to incriminate himself pursuant to the Fifth Amendment to the United States Constitution before he testified. In the absence of such advice, the defendant contends that his testimony was improperly compelled. Additionally, the defendant argues that the judge erred in not including, sua sponte, an instruction pursuant to *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 447-448 (2004), in his final charge to the jury, where the defendant's interviews at the police station had not been recorded. Finally, the defendant urges this court to invoke its plenary power under G. L. c. 278, § 33E, to grant a

---

[1]Neither the shooter nor the other masked individual was ever identified.

new trial or, alternatively, to reduce the verdict of murder in the first degree.

We conclude that the evidence was sufficient to permit a jury to find the defendant guilty of murder in the first degree. We also conclude that there was no error in the judge's determination that the defendant was not a target of the investigation at the time of his grand jury testimony. However, we announce a prospective rule requiring self-incrimination warnings to those witnesses testifying before the grand jury who fall within a class of persons that we define as targets, or those reasonably likely to become targets, of the investigation. Finally, we also conclude that the defendant was not entitled to a *DiGiambattista* instruction where it was not requested at trial. Because we find no reversible error and discern no basis to exercise our authority under G. L. c. 278, § 33E, we affirm the defendant's conviction.

1. *Background.* We summarize the facts as the jury could have found them, in the light most favorable to the Commonwealth. *Commonwealth* v. *Sanna,* 424 Mass. 92, 93 (1997).

a. *Threats.* The defendant and the victim were longtime friends and street-level marijuana dealers. At some point, however, a rift arose between them over a debt of $3,700 that the victim owed to the defendant. In August, 2005, the defendant told a mutual friend that the victim was "lucky he was such a good friend of [mine] because anybody else would have been killed a long time ago for the money he owed [me]." He later left the victim a voicemail message, where he angrily stated, "cracker, you better have my money, or I'm going to shoot you."

In November, 2005, the victim's friend, Shawn Flaherty, attempted to purchase a pound of marijuana from the defendant for $1,300. Before the transaction took place, the defendant told Flaherty that "Paul Mullen owed him $3,700 for a long time now and that he was upset that it had been so long, he was extremely upset, that he wanted to kill Paul because of it, and that he would shoot him in the stomach." He added, in a hostile tone, "I'll shoot that dude." He then took Flaherty's money, did not give him his marijuana, and told him to get his money from the victim.

Later that month, the defendant saw Steven Deutsch, a friend of the victim, at a bar. Deutsch spoke to the defendant in an attempt to get Flaherty's money back. The defendant responded by saying, "tell Mully if he doesn't pay me my money, I'm going to shoot him in the stomach."[2]

b. *The shooting.* On December 1, 2005, the defendant drove the automobile owned by his girl friend, Erin Andrews, to a bar, where he spent some time socializing with two friends, Serena Epps and Takisha Turner. While there, he recognized another friend, Eldon Terry (Eldon), and the two left together and drove to Boomers nightclub.[3] Once there, they met the victim and his friend, Shawn Montiero. The four went into the club and spent the night having drinks together.

After the nightclub closed, the defendant and the victim agreed that the victim would go home, retrieve some marijuana, and call the defendant, and then the two would meet and smoke it together. The defendant then drove with Eldon to the Hess station and parked at the rear of the right side of the building, knowing that this area was out of the view of any security cameras. The two got out of the vehicle, and when Eldon went to use the restroom, the defendant began chatting with women outside the station. He went into the Hess station to buy a cigar "blunt," where he encountered, among others, Epps, Turner, and Tomiko Terry (Tomiko), the mother of his child. After noticing Eldon and "paying him no mind," he continued "roaming around" the station and parking lot, periodically checking on his vehicle.

When he returned to his vehicle to begin preparing to smoke marijuana, the defendant received a cellular telephone call from the victim, who agreed to meet the defendant at the Hess station.[4] The victim arrived almost immediately, and the defendant

---

[2]While it appears that neither the victim nor the witnesses took any of these threats seriously, the jury could have concluded that they were expressive of the defendant's anger with the victim and probative of his motive.

[3]There was some confusion among the witnesses whether the nightclub was called Boomers or the Safari Club at the time of the incident. We refer to it as Boomers.

[4]According to the defendant, the conversation went as follows: the victim called the defendant and asked where he was. The defendant replied, "I'm up at the Hess. I'm about to roll this blunt." On hearing this, the victim replied, "Hold on a second. I'm on the way there. Let me roll it."

directed him to the open driver's side door of the vehicle. He told the victim to roll a blunt of marijuana while he went inside to purchase pizza and soda for both himself and the victim. Once inside the station, the defendant made idle conversation with the clerk, who did not know the defendant, for ten minutes. He did not attempt to purchase anything.

Meanwhile, as the victim sat alone in the driver's seat of the vehicle, two masked men walked to the back of the station. Jane Morais, an eyewitness sitting in a parked vehicle, noticed the two men and described one of them as a thin, "olive"-skinned man, wearing black shorts, a black mask, and a black hooded sweatshirt, standing about five feet, eight or nine inches tall. She described the other as a thin man wearing black pants, a black hooded sweatshirt, and a lighter jacket.

Moments later, Turner, who was standing outside the Hess station, saw a tall, thin, masked, very dark-skinned black man walk to the front of the vehicle and begin shooting at the victim. The shooter was wearing a black baseball cap, a black T-shirt, black jeans, and black shoes, under what appeared to be a black Carhartt-brand jacket. She described him as approximately six feet tall. The victim was shot in the head, chest, and abdomen, perforating his brain, heart, and viscera. He lost consciousness almost instantaneously, and died within minutes.

Turner ran into the store, found Eldon and Epps, and told them what had happened. She noticed the defendant standing in front of the station, after which he followed her inside and announced that "someone" had been shot. He also announced to the clerk, "somebody's laying on the side of [my] car." He then told Turner and Epps, "you all need to get out of here," and, "go home." Turner, Epps, and Eldon then got into Epps's automobile and drove off, as the defendant told them to "get home safely, be careful."

The defendant moved the victim's body out of the driver's seat and onto the concrete and drove to Andrews's house. Jessica Campbell, Andrews's cousin, heard the defendant yelling for Andrews and came to the window. She saw the defendant standing in the driveway, talking to a five foot ten inch tall black man. He was wearing a dark hooded sweatshirt and dark jeans.

Andrews eventually went outside, and noticed the other man

walking away from the defendant while waving at him. She described him as a thin man, standing about five feet, seven or eight inches tall,[5] wearing dark jeans, a black hooded sweatshirt, and a Carhartt-brand jacket. The defendant told Andrews that the victim had been shot and then, unbeknownst to her, discarded his blood-soaked clothes in her trash.

c. *The interviews and grand jury.* On December 2, 2005, the defendant drove from Andrews's house to the police station, where he voluntarily gave an interview to police as a witness. Two months later, in February, 2006, the police asked the defendant if he would be willing to submit to a second interview, to which he agreed. At the second interview, which took place on February 6, 2006, the defendant was read the Miranda rights, although the police did not intend to place him in custody and still viewed him as a witness.

The officers explained to the defendant that the court preferred that in-station interviews were tape recorded, and thus they would prefer to do so. The defendant stated that he did not want the interview to be recorded, and signed a form indicating his waiver. Once the second interview began, the officers told the defendant that their investigation had revealed that some of his initial statements to them were not true.[6] The defendant explained that he had not wanted to be considered a "snitch," and gave several different, yet still exculpatory, versions of the events.

On February 10, 2006, pursuant to a summons, the defendant testified before the grand jury. He gave another version of the events, and further explained the inconsistencies between his initial interview and his grand jury testimony. His grand jury testimony was admitted in evidence at his trial in order to illustrate his conflicting stories and outright lies.

2. *Discussion.* a. *Sufficiency of the evidence.* The defendant argues that the evidence was insufficient to show that he acted in joint venture with the shooter. We conclude that the Commonwealth's evidence was sufficient to support a conviction of murder in the first degree.

The standard we apply is whether, after viewing the evidence

---

[5] Erin Andrews did not see the man's face, and was unable to discern his skin color.

[6] These inconsistent statements are discussed more fully, see part 2.a, *infra.*

in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Circumstantial evidence alone may be sufficient to meet the burden of establishing guilt. *Commonwealth* v. *Nolin*, 448 Mass. 207, 215 (2007). *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). Indeed, the Commonwealth may submit a case wholly on circumstantial evidence, and inferences drawn from that evidence "need only be reasonable and possible; [they] need not be necessary or inescapable." *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989), quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). Where conflicting inferences are possible from the evidence, "it is for the jury to determine where the truth lies." *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992), quoting *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981).

There is no question that the evidence sufficed to show that the shooter acted with an intent to kill and premeditation when he donned a mask and fired eight shots into the victim as he sat defenseless in a vehicle. See *Commonwealth* v. *Diaz*, 426 Mass. 548, 552-554 (1998) (stating requirements for finding of murder in first degree). However, where the Commonwealth proceeded on a theory of joint venture, we must consider whether the Commonwealth established that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 467-468 (2009). A joint venture "may be proved by circumstantial evidence." *Commonwealth* v. *Bright*, 463 Mass. 421, 435 (2012), quoting *Commonwealth* v. *Braley*, 449 Mass. 316, 320 (2007). The intent required for the offense may be inferred from "the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Cohen*, 412 Mass. 375, 381 (1992), quoting *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

The jury could properly have considered the defendant's four threats to shoot the victim over a debt as evidence of his motive and intent to commit the murder. See *Commonwealth* v. *Morgan*,

449 Mass. 343, 346-348, 351 (2007). The jury also could have found that the defendant arranged to meet the victim at the Hess station, parked in an area the defendant knew to be unrecorded by surveillance, and left the victim alone in the vehicle while the defendant pretended to purchase pizza and soda for the two of them during the ten-minute period when the victim was shot. An inference could properly be drawn from these facts that the defendant was motivated to kill the victim by the debt that the victim owed to him, commissioned a shooter to carry out the murder, lured the victim into a position where the shooting would be possible, and attempted to construct an alibi for himself by being seen chatting aimlessly with the clerk of the Hess station while the murder took place. See *id.* at 351-352 (sufficient evidence where defendant had motive and opportunity, and announced intention to kill victim). See also *Commonwealth* v. *Fitzpatrick*, 463 Mass. 581, 594 (2012) (sufficient where Commonwealth produced evidence that defendant had motive and opportunity to commit murder, along with evidence showing consciousness of guilt); *Commonwealth* v. *Cordle*, 404 Mass, 733, 739, 741 (1989) (presence at scene of crime in addition to evidence of ill will and consciousness of guilt sufficient); *Commonwealth* v. *Anderson*, 396 Mass. 306, 311-313 (1985) (evidence that defendant was alone with victim at approximate time of murder and consciousness of guilt was sufficient to sustain verdict).

Further, the jury could have found that the defendant met with the shooter in Andrews's driveway immediately after the murder, which would support a permissible inference that he was complicit in the shooting. While the descriptions of the man in the driveway varied somewhat, both witnesses agreed that he was a thin man, between five feet, seven inches and six feet tall, wearing dark pants and a dark shirt. While Andrews did not notice that he was black, she did notice that he was wearing what appeared to be a Carhartt-brand jacket. This description was sufficiently similar to Turner's description of the shooter as a thin black man wearing black pants, a black shirt, and a Carhartt-brand jacket, as well as Morais's description of a thin man wearing dark pants, a dark shirt, and a light jacket, to allow the jury to find that the man in the driveway participated in the shooting

that had occurred moments earlier. See *Commonwealth* v. *Sylvia*, 456 Mass. 182, 190-191 (2010) (varied and erroneous descriptions of shooter acceptable where other evidence supported identification). Such an inference is certainly not necessary or inescapable, but it is permissible given the evidence presented. *Beckett*, 373 Mass. at 341.

In addition, the defendant's actions and statements after the shooting showed a consciousness of guilt that supported the Commonwealth's case. "In conjunction with other evidence, a jury may properly consider actions and statements of a defendant that show a consciousness of guilt." *Rojas*, 388 Mass. at 629. While consciousness of guilt alone is insufficient to support a guilty verdict, such evidence may be sufficient when combined with other probable inferences. See *Commonwealth* v. *Best*, 381 Mass. 472, 483 (1980); *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 52 (1975). This type of conduct includes making false or inconsistent statements to police. See *Commonwealth* v. *Basch*, 386 Mass. 620, 624-625 (1982); *Commonwealth* v. *Connors*, 345 Mass. 102, 105 (1962).

Here, the defendant's inconsistencies were many. He initially told police that he did not know anyone in the Hess station, despite the fact that he knew several of the patrons — including Turner, an eyewitness to the shooting, and Tomika, the mother of his child — in what could be seen as an attempt to hamper the police officers' investigation by preventing them from locating witnesses. *Commonwealth* v. *Porter*, 384 Mass. 647, 653 (1981) (intentionally false and misleading statements by defendant could have been found to indicate consciousness of guilt). See *Montecalvo*, 367 Mass. at 52; *Commonwealth* v. *Spezzaro*, 250 Mass. 454, 457 (1925). The defendant also falsely told police that the victim told the defendant to leave him in the parking lot and leave the scene. This could be viewed as medically improbable in light of the victim's wounds and, rather, an attempt at concealing the true reason for his flight. See *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990) ("Flight is perhaps the classic evidence of consciousness of guilt"); *Commonwealth* v. *Booker*, 386 Mass. 466, 470 (1982). He also denied that he met with anyone outside Andrews's house, which was refuted by two witnesses. He also claimed he did not have any

monetary issues with the victim. In short, the defendant's inconsistent statements could be seen as an attempt to hide witnesses and conceal his motivation and his actions.

The evidence included other instances of consciousness of guilt. The defendant acted as though he did not know the victim immediately after the shooting. He discarded his bloody clothing at Andrews's house, a fact that he did not disclose to anyone, and he lied to Andrews about many of the details of the shooting.[7] Essentially, the Commonwealth's case is replete with evidence of the defendant's consciousness of guilt.

While the Commonwealth's case was largely circumstantial, and not every inference the jury could draw was compelled, permissible inferences need not be necessary or inescapable. *Beckett*, 373 Mass. at 341. While the defendant's theories of the case are possible,[8] the jury were warranted in rejecting them based on the evidence presented.

b. *Self-incrimination advisement.* The defendant argues that, at the time of his testimony before the grand jury, he was a target of the investigation and the Commonwealth was thus required to advise him of his Fifth Amendment right to avoid self-incrimination. The United States Attorneys' Manual, § 9-11.151 (2009), defines a "target" of a grand jury investigation as "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." We find no error in the judge's ruling that the defendant was not a target, and that the prosecutor was not

---

[7]The defendant told Andrews that he had gone to the bar by himself; that a woman had specifically told him, "Tommy, your car is getting shot up"; that the victim asked to be taken out of the car and laid down because he was in pain; and that he had lost his cellular telephone that night.

[8]The defendant postulates that the facts support three inferences: (1) the shooter was en route to another shooting and killed the victim on impulse when he was surprised at the sight of him; (2) the shooter intended to kill the defendant, a black man, and mistakenly shot the Caucasian victim; or (3) someone at the Hess station saw the victim and decided to shoot him. While all three scenarios are feasible, the defendant errs in arguing that these theories were equally as supported by the evidence as the Commonwealth's theory. There was little to no evidence supporting these possibilities beyond mere speculation, and the Commonwealth need not disprove every possible theory of the case. See *Brown* v. *Commonwealth*, 407 Mass. 84, 89 (1990), *S.C.*, 414 Mass. 123 (1993).

required to advise him of his Fifth Amendment rights before eliciting his testimony.

We first review the judge's finding that the defendant was not a target. In reviewing a judge's ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, "but conduct an independent review of his ultimate findings and conclusions of law." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). The judge determines the weight and credibility of the testimony, *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 321 (2001), while "our duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

The police officers testified that the defendant had never, throughout his two interviews, been in custody or been a suspect. He voluntarily came to the police station and submitted to both interviews. Further, as of the date the defendant appeared before the grand jury, he was described by the police as "somebody that was very interesting," because his statements throughout the two interviews had been inconsistent, but he was not a "suspect," for whom they had either "probable cause" or "reasonable suspicion" to believe was involved in the murder.[9] Based on this record, we see no error in the judge's finding that the defendant was not a target when he was called to the grand jury to testify.

Even if the defendant were a "target," the Commonwealth was under no obligation to warn him of that status. *United States* v. *Washington*, 431 U.S. 181, 188-190 (1977) (warning witness that he is target of grand jury investigation is not constitutionally required). *Commonwealth* v. *D'Amour*, 428 Mass. 725, 743 (1999) (same). While we do not disturb our holding in *D'Amour*, we consider for the first time the defendant's separate argument that the Commonwealth must advise targets or

---

[9]In response to the prosecutor's inquiry regarding whether the defendant was a suspect, Officer Scott Warmington of the Brockton police department responded: "I think he was a little more than a witness. But, like I said, he was giving us information. It wasn't adding up. Was he a suspect that we believed we had probable cause or even reasonable suspicion? No."

potential targets of the grand jury's investigation of their right not to incriminate themselves.

While the United States Supreme Court has indicated that full Miranda warnings are not required for grand jury witnesses, *United States* v. *Mandujano*, 425 U.S. 564, 580-581 (1976), it has never determined "whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses." *United States* v. *Pacheco-Ortiz*, 889 F.2d 301, 307 (1st Cir. 1989), quoting *Washington*, 431 U.S. at 186. The United States Court of Appeals for the First Circuit has, however, "expressed 'considerable sympathy' with the approach 'of giving at least notice that a witness need not testify if such would incriminate him.' " *Pacheco-Ortiz*, *supra* at 308, quoting *United States* v. *Chevoor*, 526 F.2d 178, 181-182 (1st Cir. 1975), cert. denied, 425 U.S. 935 (1976) (grand jury context "gives rise to a kind of coerciveness suggesting the wisdom of giving at least notice that a witness need not testify if such would incriminate him"). See *United States* v. *Babb*, 807 F.2d 272, 278 (1st. Cir. 1986) (assuming that some warning was constitutionally mandated where defendant was in fact warned of Fifth Amendment rights). See also *United States* v. *Whitaker*, 619 F.2d 1142, 1150 (5th Cir. 1980) (declining to exercise supervisory jurisdiction to require warning of Fifth Amendment rights, but noting that "we agree that it is a better practice to so inform a potential defendant prior to his testimony before a grand jury").

The United States Department of Justice requires that grand jury "target[s]" and "subject[s]," defined as persons "whose conduct is within the scope of the grand jury investigation," United States Attorneys' Manual, at § 9-11.151, be advised of their right to avoid self-incrimination as a matter of policy.[10] See *Commonwealth* v. *Gilliard*, 36 Mass. App. Ct. 183, 188

---

[10]Section 9-11.151 of the United States Attorneys' Manual requires that the prosecutor warn "subject[s]" that (1) the grand jury is conducting an investigation of possible violations of Federal criminal laws; (2) they may refuse to answer any question if a truthful answer to the question would tend to incriminate them; (3) anything they say may be used against them before the grand jury or in a subsequent legal proceeding; and (4) if they have retained counsel, they may be permitted a reasonable opportunity to step outside the grand jury room to consult with counsel if they so desire. As for witnesses who are "target[s]," they must also be warned that their conduct is being investigated for possible violation of Federal criminal law. *Id.*

(1994); *Pacheco-Ortiz*, 889 F.2d at 308. Further, courts in other States have opted to require some variation of a rights advisement to those who could be considered targets of the grand jury's investigation. See, e.g., *State* v. *Caperton*, 276 Mo. 314, 319-320 (1918) ("No person whose alleged crimes are under investigation by a grand jury ought to be haled unwillingly before that body and questioned as to such crimes. . . . [H]e ought to be advised that it is his privilege not to testify unless he wants to do so, and that anything he may say may be used against him"); *State* v. *Williams*, 59 N.J. 493, 503 (1971) (citing precedent that target of grand jury proceeding must be advised that he is target and of right not to incriminate himself); *State* v. *Cook*, 11 Ohio App. 3d 237, 241 (1983) (witness is "putative defendant if, at the time he appears before the grand jury, the witness is potentially the focus of the investigation and is thus subject to possible indictment," and he must be warned that he has constitutional privilege to refuse to answer any question that may incriminate him, that statements may be used against him, and that he may have attorney to confer with outside grand jury room).

The issuance of a summons requiring a witness to appear and give testimony before the grand jury is a form of compulsion.[11] Because grand jury testimony is compelled, it ought to be ameliorated with an advisement of rights where there is a substantial likelihood that the witness may become an accused; that is, where the witness is a "target" or is reasonably likely to become one. Accordingly, we adopt a rule that where, at the time a person appears to testify before a grand jury, the prosecutor has reason to believe that the witness is either a "target" or is likely to become one,[12] the witness must be advised, before testifying,

---

[11]At the request of the court, and pursuant to Mass. R. A. P. 16 (1), as amended, 386 Mass. 1247 (1982), the Commonwealth has produced a copy of the type of grand jury summons sent to the defendant. The summons reads: "In the name of the Commonwealth, you are commanded to appear before the Plymouth County Grand Jury at the Superior Court in the County of Plymouth located at [location] on [date] and from day to day thereafter until said action is disposed of, to testify in the matter of Commonwealth vs. Grand Jury Investigation. Hereof fail not, as you will answer your default under the pains and penalties of law."

[12]We adopt the United States Attorneys' Manual definition of "target," as noted in the text, *supra.*

that (1) he or she may refuse to answer any question if a truthful answer would tend to incriminate the witness, and (2) anything that he or she does say may be used against the witness in a subsequent legal proceeding. The rule we adopt is meant to discourage the Commonwealth from identifying a person as a likely participant in the crime under investigation, compelling his or her appearance and testimony at the grand jury without adequate warnings, and then using that testimony in a criminal trial.

This rule is not a new constitutional rule, but rather an exercise of our power of superintendence "to regulate the presentation of evidence in court proceedings." *Commonwealth* v. *Dagley*, 442 Mass. 713, 720-721 (2004), cert. denied, 544 U.S. 930 (2005), quoting *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 444-445 (2004). See *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996) (prospectively adopting six-hour safe harbor period for postarrest interrogation as exercise of superintendence authority, not new constitutional rule). Therefore, this rule is only required to be applied prospectively to grand jury testimony elicited after the issuance of the rescript in this case. *Dagley, supra* at 721.

c. *Videotaped interview.* The defendant argues that the trial judge erred in not giving a *DiGiambattista* instruction where the initial interview at the police station on December 2, 2005, was unrecorded.[13] This court held in *DiGiambattista*, 442 Mass. at 447-448:

> "[W]hen the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station), and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction advising that the State's highest court has expressed a preference that such interrogations be recorded wherever

[13]The defendant's interview on February 6, 2006, also was not recorded, pursuant to his own refusal to consent to a recording. The defendant does not argue that he was entitled to a *DiGiambattista* warning based on this second, unrecorded interview, instead focusing only on the December 2, 2005, interview. In any event, our analysis would not change upon consideration of the second interview.

practicable, and cautioning the jury that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care."

The defendant may have been entitled to an instruction, because he was interviewed during the course of an investigation at "a place of detention," namely, a police station.[14,15] *Id.* However, a trial judge need only give a *DiGiambattista* instruction upon request. *Id.* Where the defendant did not request such an instruction, there was no error.

The defendant has not claimed that his trial counsel was ineffective, although he briefly argues that "[f]or no apparent reason, defense counsel did not ask for a *DiGiambattista* instruction. . . . [T]here could have been no legitimate, strategic reason not to make such a request and no reason for the judge not to give one." To the contrary, trial counsel may have had valid reasons not to request a *DiGiambattista* instruction. First, the value of such an instruction is lessened where, as here, the defendant's statements, dubious as they may be, were largely exculpatory. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 801-802 (2010), cert. denied, 131 S. Ct. 2441 (2011) (judge's failure to give instruction not prejudicial where defendant's comments partially exculpatory). Further, trial counsel may have simply opted not to bring any more attention to the defendant's statements than necessary. In any event, the record before us does not support a claim of ineffectiveness.

d. *General Laws c. 278, § 33E.* We have reviewed the record

[14]The situation here is distinguished from that in *Commonwealth* v. *Issa*, *ante* 1, 20 (2013), in which the defendant was not entitled to an instruction where he "voluntarily and without advance notice showed up at the [police] station," and "[t]he police had not asked the defendant to come in or be interviewed, did not know who the defendant was until he told them, had yet to ascertain that the cause of death was a homicide, and did not identify the defendant as a suspect until after the completion of the interview." Here, the police knew there had been a murder, and the defendant informed them that he had been with the victim moments before he was killed. He therefore was more closely connected to the crime than the defendant in *Issa*, and may therefore have been entitled to a *DiGiambattista* instruction.

[15]This is true even where, as here, the defendant affirmatively requests that the interview not be recorded. See *Commonwealth* v. *Rousseau*, 465 Mass. 372, 392 (2013).

in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised on appeal. We find no such reason, and we decline to exercise our powers under the statute.

*Judgment affirmed.*