NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1689                                            Appeals Court

COMMONWEALTH  vs.  YONAS TEWOLDE
(and five companion cases[1]).


No. 13-P-1689.

Suffolk.     January 5, 2015. - October 1, 2015.

Present:  Katzmann, Sullivan, & Blake, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
     Voluntariness of statement, Self-incrimination, Grand jury,
     Search and seizure, Probable cause.  Practice, Criminal,
     Admissions and confessions, Grand jury proceedings, Motion
     to suppress.  Witness, Privilege, Self-incrimination.
     Search and Seizure, Expectation of privacy, Probable cause.
     Probable Cause.  Cellular Telephone.


     Indictments found and returned in the Superior Court
Department on July 8, 2011.

     Pretrial motions to suppress evidence were heard by Charles
J. Hely, J.

     Applications for leave to prosecute interlocutory appeals
were allowed by Fernande R. V. Duffly, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeals were
reported by her to the Appeals Court.


     Cailin M. Campbell, Assistant District Attorney, for the
Commonwealth.

_____

     [1] Two against Yonas Tewolde and three against Karl Prescott.

Elda S. James for Karl Prescott.
Matthew A. Kamholtz for Yonas Tewolde.

KATZMANN, J.  This is an interlocutory appeal taken from rulings in a suppression proceeding, and presents the following questions:  whether a statement, given in an interview prior to grand jury testimony by a defendant who had been subpoenaed to testify after previously asserting that he did not wish to speak without an attorney, was voluntary; whether testimony before the grand jury was given in violation of the privilege against self-incrimination; and whether cellular tower data and cell site location information were obtained in violation of the protections against unreasonable searches and seizure.

The case arises from the shooting murder of Paul Fagan. The two defendants here, Yonas Tewolde and Karl Prescott, were each indicted on charges of murder in the first degree of Paul Fagan, unlawful possession of a firearm, and unlawful possession of a loaded firearm.  They were both subpoenaed to testify before a grand jury; they did so testify, and subsequently moved to suppress that testimony.  Tewolde also submitted to an interview on June 7, 2010, prior to his grand jury testimony, and moved to suppress his interview statements.  A Superior Court judge (motion judge) allowed both of Tewolde's motions to suppress, suppressing the interview statements on the grounds that Tewolde's submission to the interview was involuntary and

suppressing the grand jury testimony on the grounds that he should not have been compelled to testify because it violated his privilege against self-incrimination. Prescott's motion was denied because the motion judge concluded that he testified voluntarily and without objection. Finally, both defendants moved to suppress cellular (cell) tower data and cell site location information (CSLI). The Commonwealth obtained this information by court order to find evidence about the shooting. The motion judge denied these motions.

The Commonwealth now appeals from the motion judge's rulings allowing Tewolde's motions to suppress. Prescott appeals from the denial of his motion to suppress his grand jury testimony. Both defendants also filed applications for interlocutory review of the denial of their motions to suppress cell tower data and CSLI. We address each individually.

Background. We summarize the facts relevant to the crime as found by the motion judge in his thorough and very thoughtful decision.[2] The motion judge held an evidentiary hearing on September 5 and 6, 2012, on Tewolde's and Prescott's motions to suppress grand jury testimony and CSLI, as well as a

---

[2] We reserve certain details for discussion with the specific issues raised.

nonevidentiary hearing on September 25, 2012, on Tewolde's supplementary motion to suppress his interview statements.[3]

On May 2, 2010, at 7:59 P.M., a police gunshot notification system indicated gunshots fired on Stafford Street in the Roxbury section of Boston. Witnesses told the police that they saw two dark-skinned African-American males, one with "loose dreadlocks" and the other with "tighter braids," fire several gunshots on Stafford Street. The police found the victim, Paul Fagan, on Stafford Street with multiple gunshot wounds in the chest and back. He died later that night from the wounds.

Witnesses told the police that the shooters were standing next to a gold Cadillac motor vehicle with a brown top, which "was on Stafford Street near the intersection of Dennis Street," and that the shooters fled in the Cadillac. At 8:00 P.M. that same night, "a gold Cadillac hit a woman on Clifford Street in a hit-and-run accident. The hit-and-run accident happened about three-tenths of a mile from the shooting scene." Two witnesses (one of the shooting and the other of the hit-and-run) reported the Cadillac's registration plate numbers, their accounts varying only by one number.

The next day the police responded to Langford Park in Roxbury. When they arrived, a witness told them that he saw

---

[3] The defendants made several other motions to suppress and motions to dismiss that are not part of this appeal.

three males in their late teens and early twenties around a Cadillac, wearing gloves.  They wiped down the Cadillac with wipes from a container of cleaning wipes.  One of the males told the police that a man he did not know offered them $100 to clean the Cadillac.  He said that the man gave them gloves and cleaning wipes to use.  The police photographed and took custody of the Cadillac.  They took several items that they found in the Cadillac and in the vicinity of Langford Park.  Several of these items, including a black plastic bag found near the Cadillac, were preserved.  Tewolde's fingerprints were found on this bag.

Discussion.  1.  Suppression of Tewolde's statements in the interview and grand jury testimony.  The motion judge determined that Tewolde's submission to the interview was involuntary and that the order to compel him to testify before a grand jury violated his rights against self-incrimination under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law." Commonwealth v. Howard, 469 Mass. 721, 726 (2014) (quotations omitted).  "We make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found."  Ibid. (quotations omitted).

a.  Tewolde's interview statements.  On June 2, 2010, Sergeant Detective Daniel Duff and Detective Joshua Cummings went to Tewolde's home.[4]  Although Tewolde initially spoke to them, he refused to continue and told them he would not answer any more questions.  He said that if they wanted to speak with him, they "would have to get a warrant"[5] and declared that he wanted a lawyer.[6]  In response to that statement, the detectives proceeded to get a subpoena.  Detective Cummings testified that upon leaving Tewolde's home, they "printed out" the subpoena and returned to serve Tewolde that same day.

Tewolde went to the courthouse on June 7, 2010, as the subpoena required, and a detective met him in the lobby.  The detective ushered him through security and into the offices of the District Attorney.  They proceeded into a small interview

---

[4] Tewolde's hair was in long, thick braids on June 2, 2010, matching the description a witness gave of one of the shooters.

[5] The detectives understood that by the term "warrant," Tewolde meant subpoena or summons.

[6] Detective Cummings testified that Tewolde

"said he didn't want to answer any more, get a warrant to bring him in for questioning.  Then he stated he wanted to get it over with.

"Sergeant Detective Duff asked [Tewolde] if he ever borrowed a brown Cadillac.  He refused to answer and again stated that if he were going to answer any questions, he wanted a lawyer to be with him.  The interview was then concluded."

room where the prosecutor, Detectives Paul MacIsaac and Cummings, and Sergeant Duff engaged Tewolde in an interview lasting thirty to sixty minutes prior to his grand jury testimony.[7]  At the end of the interview, the prosecutor told Tewolde that he would be going into the grand jury room to testify and that he had a right to an attorney.  Tewolde then asserted his right to counsel, as he had done five days earlier.

---

[7] According to the investigation report written by Detective MacIsaac, the following unfolded during the interview.  Tewolde was questioned about the Cadillac police suspected was involved in the hit-and-run and the homicide.  Tewolde confirmed that he knew of the Cadillac and borrowed it from its owner, "Noah," that he borrowed it and drove it for several days in early May, 2010, and that he returned the Cadillac to Noah at his place of work (a statement Detective MacIsaac noted he knew was false). The questioning then turned to where and when he dropped off the Cadillac.  Tewolde changed his original story and stated that he dropped it off on Copeland Street in Roxbury and left the keys for Noah at his place of work.  When asked if anyone was with him when he dropped off the Cadillac, Tewolde stated that he was alone.  Tewolde was asked whether he ever cleaned the Cadillac. He stated that he cleaned it himself or at "Scrub a Dub," or paid his little cousin, nephew, or brother to clean it.  He indicated that no one else drove the Cadillac when he was borrowing it.  Tewolde was questioned about whether he had friends in the Cadillac the last time he borrowed it.  He stated that he could not remember but he may have.  During the interview Tewolde provided his old cellular telephone number, but Detective MacIsaac noted that he knew from Noah that Tewolde's old cellular telephone number was different from what was provided by Tewolde.

With respect to Tewolde's statements during the interview prior to the grand jury testimony, the main question before us is whether they were voluntary.[8]  The Commonwealth bears the

> "heavy burden of establishing that [the defendant's statements were] voluntary.  In meeting this burden, the Commonwealth must prove beyond a reasonable doubt that in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne, but rather that the statement was the result of a free and voluntary act."

Commonwealth v. Baye, 462 Mass. 246, 256 (2012) (quotations omitted).  See Commonwealth v. Molina, 467 Mass. 65, 75-76 (2014).  The motion judge found that Tewolde's statements in the interview prior to his grand jury testimony were involuntary and therefore allowed his motion to suppress.  The motion judge based his decision on the special circumstances leading up to

---

[8] This is not a question whether the police actively misled Tewolde; rather, the ultimate question is whether he voluntarily answered questions.  We distinguish the instant case from those like Commonwealth v. Baye, 462 Mass. 246 (2012), where the defendant was affirmatively misled and statements from the police were "sufficiently coercive to render [the defendant's statements] involuntary," id. at 262 (quotation omitted), and also from cases in which the defendant "was lulled into a false sense of security."  Commonwealth v. Carp, 47 Mass. App. Ct. 229, 234 (1999).  Tewolde compares the instant case to Commonwealth v. Smallwood, 379 Mass. 878 (1980), arguing that in Smallwood, the court "emphatically disapprov[ed]" of using a subpoena to compel a witness to attend an interview.  Id. at 887.  He argues that in Smallwood, there was a "blatant" misuse of a subpoena, and that the use of the subpoena here is "covert" misuse.  Because our focus is not on the affirmative actions of the Commonwealth but, rather, whether Tewolde's statements were voluntary, we do not address this argument.

the interview and the testimony of the detectives, which he did not find credible.

Specifically, the motion judge was not convinced that Tewolde was informed of his right to counsel prior to the end of the interview.[9] The motion judge found that this was the first time Tewolde was informed of his right to counsel and that he invoked it at that time. The motion judge concluded that Tewolde believed that he was required to speak to the police sergeant, the detectives, and the prosecutor when he arrived at the courthouse pursuant to his subpoena, and that his submission to the interview was thus involuntary. Considering the totality of the circumstances, we conclude that the motion judge did not err in his determination that Tewolde reasonably believed he was required to submit to the interview, that no one informed him otherwise until the end of it, and that therefore he submitted to it against his will.

The Commonwealth argues that the motion judge's findings were clearly erroneous because the detectives testified that

---

[9] The failure to inform Tewolde of his rights earlier is relevant only as to Tewolde's belief that the subpoena required him to speak during the interview. In Commonwealth v. Woods, 466 Mass. 707, 709 (2014), the court issued a prospective rule "requiring self-incrimination warnings to those witnesses testifying before the grand jury who fall within a class of persons that we define as targets, or those reasonably likely to become targets, of the investigation." However, because the grand jury proceedings in the instant case occurred before Woods, the rule does not apply here.

Tewolde was informed earlier.  This argument ignores the fact

that the judge can make credibility determinations.  See

Commonwealth v. Scott, 440 Mass. 642, 646 (2004); Commonwealth

v. Baye, supra at 255 ("The weight and credibility to be given

oral testimony is for the judge"); Commonwealth v. Bernard, 84

Mass. App. Ct. 771, 774 (2014).  The conflicting testimony

regarding when Tewolde was informed was for the motion judge to

resolve.  See ibid.  As here, where the motion judge wrote,

> "[a]t the motion hearing, the witnesses' memories were not
> clear on whether the assistant district attorney also
> informed [Tewolde] at the beginning of the interview of the
> right to counsel.  The court is not persuaded by the
> evidence that this warning was also given at the beginning
> of the interview,"

it is apparent that the motion judge, in his resolution of the

conflicting testimony, only credited portions of the testimony

and discredited others.  See ibid.

We note that under many circumstances, eliciting testimony

pursuant to a subpoena is not considered coercive.  See

Commonwealth v. Beauchamp, 49 Mass. App. Ct. 591, 607 (2000),

quoting from United States v. Washington, 431 U.S. 181, 187-188

(1977) ("testimony given under oath pursuant to grand jury

subpoena is not so coercively compelled").  Cf. Commonwealth v.

Smallwood, 379 Mass. 878, 887 n.3 (1980).  Because of the unique

circumstances here, however, reviewing it within the context of

Tewolde's silence and previously expressed desires not to speak

and to get an attorney, the record supports the motion judge's conclusion that Tewolde was operating under the impression that the subpoena applied to the interview.  We conclude that the motion judge's findings and conclusions of law were not clearly erroneous, and we affirm the suppression of the interview statements.

b.  <u>Tewolde's grand jury testimony</u>.  After the interview, Tewolde spoke briefly with a court-appointed defense attorney. Tewolde was not forthright with his attorney about his involvement in the case, and instead claimed that he had nothing to hide and that he had no involvement.  The prosecutor explained to defense counsel that she knew Tewolde had, at some point, been in possession of a car that the police suspected had been used in a homicide and that she was trying to determine whether he was in possession of the car on the date of the homicide.  Defense counsel proceeded to advise Tewolde that he had no Fifth Amendment privilege; Tewolde then briefly testified before the grand jury.

The prosecutor cut this first grand jury proceeding short because Tewolde stated that he did not want to testify.[10]  The

_____

[10] The first grand jury proceeding transpired as follows:

<u>The prosecutor</u>:  "Did you have enough time to speak with [defense counsel] relative to your concerns and relative to your testimony today?"

parties then went before the Superior Court first session judge to determine whether Tewolde could exercise his Fifth Amendment privilege against self-incrimination.  The prosecutor provided the same limited explanation of the status of the investigation to the first session judge as she had provided to defense counsel -- that she knew that Tewolde had been in possession of a car that the police suspected was used in a homicide and she wanted to know whether he was in possession of it on the date of

---

Tewolde:  "Yes."

The prosecutor:  "And you still want to testimony [sic] today after speaking with [defense counsel]?"

Tewolde:  "I still want to testify?  I mean, I didn't really get to like have ample time, so we talked about five/ten minutes.  I didn't really understand what he was like talking about."

The prosecutor:  "Well, did you explain to him what the facts of this investigation were and the information you anticipated testifying to?"

Tewolde:  "I just explained to him what happened earlier before me getting in this room."

The prosecutor:  "Well, is it fair to say that after you spoke with [defense counsel], you indicated that you wanted to come into the grand jury and testify?"

Tewolde:  "No."

The prosecutor:  "You do not want to testify?"

Tewolde:  "Um-mmm."

The prosecutor:  "I'm going to stop the proceedings at this time."

the homicide.  The first session judge did not ask the prosecutor to make any further representations about the case or the basis of Tewolde's claim.  The prosecutor did not offer that information.  Defense counsel advised the first session judge that he did not believe Tewolde had a Fifth Amendment claim.[11]  The first session judge discussed Tewolde's obligation to testify, told him he had no right to refuse because he had no Fifth Amendment claim against self-incrimination, and then warned him that he could be "locked up" for contempt if he still refused to testify.  Tewolde then said he would testify.[12]

---

[11] Although it appears that Tewolde was not candid with his attorney regarding his conduct, he now claims ineffective assistance of counsel.  See generally Commonwealth v. Caban, 48 Mass. App. Ct. 179, 183 (1999).  In light of our affirmance of the allowance of his motions to suppress his interview and grand jury statements, we need not and do not address the ineffective assistance claim.

[12] The hearing before the first session judge on Tewolde's claim of a privilege proceeded as follows:

The judge:  "Okay.  So let me ask you this question.  You, I gather from what [the prosecutor] just said that you've already talked to her and you don't think there's any Fifth Amendment privilege."

Defense counsel:  "No."

. . .

The judge:  "Mr. Tewolde, I gather from what I've heard from [defense counsel] and [the prosecutor] that, well, number one they want you to testify in front of the grand jury which everybody has an obligation to do unless they have a Fifth Amendment right.

"And I'm hearing that there seems to be general agreement that there's, that you have no Fifth Amendment right in the sense that nothing you say could incriminate you."

Tewolde:  "Okay."

The judge:  "Or, or lead to evidence which would incriminate you.  And that you are, but that, that you're nonetheless reluctant to testify.  You don't want to testify.

"And I just want to make sure you understand from me what the stakes are.  Unfortunately, we can't excuse you from testifying.  So, given the fact that there's no Fifth Amendment right that would excuse testifying, if you refuse to testify, the government has the right to come ask you to be held in contempt and be locked up for as long as the case is pending.  In other words, until a grand jury rules on that case."

Tewolde:  "Um hmm, okay."

The judge:  "So, it's your call."

Tewolde:  "You know, I, I, do I, do . . . ."

The judge:  "Okay.  But if you don't testify, I'm pretty sure they're going to lock you up."

Tewolde:  "Yeah, I'm not [indiscernible] get locked up. [Indiscernible.]  I'll testify."

The judge:  "And they'll, and they'll keep you locked up from day to day to day to day . . . . It's not like a sentence."

Tewolde:  "Right, right."

 . . .

The judge:  "I also just again for your own sake want  to caution you, I gather . . . it's a homicide?"

Defense counsel:  "Yes."

The motion judge, citing <u>Pixley</u> v. <u>Commonwealth</u>, 453 Mass. 827, 832-833 (2009), and <u>Commonwealth</u> v. <u>Pixley</u>, 77 Mass. App. Ct. 624, 627 (2010), concluded that Tewolde's testimony before the grand jury must be suppressed because when the prosecutor sought the court order to compel Tewolde to testify over his objection, "the prosecutor was required to at least give the [first session] judge a sufficient summary of the investigation so that the [first session] judge would be able to make an informed determination on whether [Tewolde] had a valid self-incrimination basis for refusing to testify."  The motion judge then relied on <u>Taylor</u> v. <u>Commonwealth</u>, 369 Mass. 183, 189 (1975), for the proposition that "[t]he burden was on the Commonwealth to show that the witness's answers to grand jury

---

<u>The judge</u>:  "Is, if you commit perjury in front of the grand jury, they can, they can charge you with perjury and I think it carries, does it carry life in a, in a murder case?"

<u>Defense counsel</u>:  "Umm . . . ."

. . .

<u>The judge</u>:  "Whatever it is, be careful because . . . ."

<u>Tewolde</u>:  "Um hmm."

<u>The judge</u>:  "I, get them all the time here.  Cases where people go in the grand jury and say, 'I don't know anything,' and they do.  So, or they [say] something that's plainly not true.  So, I just, for your own sake, I just don't want you to walk yourself into any trouble."

<u>Tewolde</u>:  "All right.  Thank you."

questions would not lead to incriminating evidence against him."
Finally, the motion judge concluded that "[t]he [first session
judge's] order compelling [Tewolde] to testify was erroneously
obtained based on an inadequate presentation to the [first
session] judge by the prosecution."

We note that the first session judge was told by defense
counsel that he believed that Tewolde did not have a Fifth
Amendment privilege.  See note 12, supra.  We also note that the
prosecutor did not share certain details of the investigation
that would have highlighted Tewolde's available privilege.
However, we determine that what the prosecutor did share should
have been enough to alert the first session judge to it.  See
Commonwealth v. Leclair, 469 Mass. 777, 782 (2014).[13]  We
therefore affirm the allowance of the motion to suppress
Tewolde's grand jury testimony, albeit not on the ground relied
on by the motion judge.  See Commonwealth v. Va Meng Joe, 425

---

[13] The prosecutor does not have a Brady obligation at the
grand jury, and is therefore not required to reveal all the
details that the defendant suggests.  See Brady v. Maryland,
373 U.S. 83 (1963).  "Prosecutors are not required in every
instance to reveal all exculpatory evidence to a grand jury."
Commonwealth v. Trowbridge, 419 Mass. 750, 753 (1995) (quotation
omitted).  In any event, the information here is inculpatory
rather than exculpatory.  "Further, the prosecutor curtailed the
line of questioning shortly after it had commenced,"
Commonwealth v. Freeman, 407 Mass. 279, 283 (1990), in the
initial grand jury proceeding.  The result might be different if
the first session judge had inquired about the investigation and
the prosecutor did not disclose the information, but that did
not happen here.

Mass. 99, 102 (1997) (appellate court may affirm on different grounds if the basis for affirmance is supported by the record and findings; reviewing court may rely on alternative legal theory if facts found by the judge support such theory). Rather, we conclude that based on the record before her, the first session judge should have determined that Tewolde could properly invoke his privilege against self-incrimination. See In the Matter of Proceedings Before a Special Grand Jury, 27 Mass. App. Ct. 693, 698 (1989) (it is trial judge's responsibility to determine in first instance whether witness's response to questions "might be dangerous because injurious disclosure could result") (quotation omitted).

In determining whether a witness has a Fifth Amendment and art. 12 right not to testify before the grand jury, we look to the purpose of the privilege against self-incrimination and the duty of the judge to regulate it. We apply Federal standards. Commonwealth v. Martin, 423 Mass. 496, 502 (1996). "The right of a witness not to incriminate himself is secured by both the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights." Taylor v. Commonwealth, 369 Mass. at 187. The standards we apply to determine whether a claim of privilege is justified are "highly protective of the constitutionally guaranteed right against self-incrimination." In the Matter of Proceedings Before a

Grand Jury, 55 Mass. App. Ct. 17, 20 (2002), quoting from Commonwealth v. Martin, 423 Mass. at 502. See Commonwealth v. Leclair, 469 Mass. at 783. "The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime." Hoffman v. United States, 341 U.S. 479, 490 (1951) (quotation omitted).

"Because the privilege against self-incrimination is 'a fundamental principle of our system of justice,' it 'is to be construed liberally in favor of the claimant.'" Commonwealth v. Leclair, 469 Mass. at 782, quoting from Commonwealth v. Borans, 388 Mass. 453, 455 (1983). "[A] refusal to testify on Fifth Amendment grounds must be upheld unless it is 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency' to incriminate" (emphasis in original). Commonwealth v. Borans, supra at 456, quoting from Hoffman v. United States, 341 U.S. at 488. See Commonwealth v. Alicea, 464 Mass. 837, 841-842 (2013); Commonwealth v. Pixley, 77 Mass. App. Ct. at 626-627. "The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute." Commonwealth v. Martin, 423 Mass. at 502 (quotation omitted).

It is the judge's duty to determine whether a witness has a valid claim against self-incrimination, and the first session judge erred when she determined that Tewolde did not have such a claim. See ibid. ("It is for a judge, rather than a witness or his attorney, to decide whether a witness'[s] silence is justified") (quotation omitted). The transcript of the hearing before the first session judge reveals a limited judicial inquiry about the circumstances of the case, not the required "particularized inquiry." In the Matter of Proceedings Before a Special Grand Jury, 27 Mass. App. Ct. at 698.[14] In any event, as the prosecutor informed the first session judge that Tewolde had been in possession of a car that was suspected of having been used in a homicide and that she was trying to learn whether he had possession of it on the date of the homicide, "[t]he incriminatory potential of the testimony was apparent from the nature of the specific questions intended to be propounded, concerning" Tewolde's use of the car involved in the murder. Commonwealth v. Leclair, 469 Mass. at 782. It was apparent that Tewolde had a valid Fifth Amendment and art. 12 right to refuse to testify, and he should not have been ordered to testify.

---

[14] At oral argument, in response to questioning, the Commonwealth asserted that Tewolde never properly invoked the Fifth Amendment privilege. This is without merit. Both sides recognized Tewolde's statement in the initial grand jury proceeding as an assertion of the privilege; a hearing was held to determine its validity and the first session judge ruled on his Fifth Amendment rights.

Tewolde faced a "real risk" that answering whether he had possession of a car suspected of use in a murder on the date of the shooting would "tend to indicate his involvement" in the shooting.  Ibid., quoting from Commonwealth v. Martin, 423 Mass. at 502.  Even if Tewolde's answers would not directly prove criminal activity, they would "furnish a link in the chain of evidence needed to prosecute."  Commonwealth v. Martin, supra at 502, quoting from Commonwealth v. Funches, 379 Mass. 283, 289 (1979).

Because Tewolde was compelled to testify before the grand jury in violation of his privilege against self-incrimination and was subsequently charged with the crimes about which he testified, the appropriate remedy is to suppress the statements for use as trial evidence.  See Lawn v. United States, 355 U.S. 339, 345-349 (1958) (incriminating evidence obtained from defendant in violation of his Fifth Amendment rights could be reviewed by grand jury but may be suppressed for use at trial); United States v. Blue, 384 U.S. 251, 255 (1966) (grand jury can review incriminating evidence even if government acquired it in violation of Fifth Amendment rights but defendant may be entitled to suppress evidence at trial).

We further note that because "voluntariness always is a factor to be considered when evaluating the admissibility of a defendant's statements against him in a criminal trial,"

Commonwealth v. Molina, 467 Mass. at 75 n.12, we also affirm the suppression on the basis that the first session judge's order and her warning that Tewolde would be jailed if he did not testify caused him to testify against his will before the grand jury. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," Commonwealth v. Austin A., 450 Mass. 665, 667 n.4 (2008), and art. 12 provides in relevant part that "[n]o subject shall . . . be compelled to accuse, or furnish evidence against himself." Ibid. Under the circumstances, Tewolde's statements before the grand jury were involuntary and must be suppressed. See Commonwealth v. Leclair, 469 Mass. at 784-785. See also Commonwealth v. Clemente, 452 Mass. 295, 318 n.33 (2008), cert. denied, 555 U.S. 1181 (2009) (witness's "grand jury testimony could hardly be considered voluntary; he had sought to claim his privilege against self-incrimination and a judge had ruled that he had no such privilege").

Based on the foregoing reasons, we affirm the suppression of Tewolde's grand jury testimony.

2. Denial of Prescott's motion to suppress grand jury testimony. The motion judge heard testimony that the prosecutor advised Prescott of his right to counsel and that Prescott indicated that he did not need counsel. The motion judge concluded that Prescott had in fact been advised of this right

and stated that he did not need to exercise it.  The motion judge explicitly distinguished Prescott's circumstances from the unique and material circumstances in Tewolde's case, noting that Prescott voluntarily testified before the grand jury, that he did not object to testifying, and that he "did not abruptly end an interview a few days earlier by refusing to answer any more questions without an attorney and without a warrant."[15]

The motion judge denied Prescott's motion to suppress on the grounds that there was no violation of his right to counsel or privilege against self-incrimination and that his statements in both the interview prior to the grand jury testimony and in his grand jury testimony were voluntary.  We affirm this denial as we do not see any clear error in the motion judge's findings of fact nor do we see error in his conclusions of law.  See Commonwealth v. Howard, 469 Mass. 721, 726 (2014).

3.  Suppression of defendants' cell tower data and CSLI. Pursuant to 18 U.S.C. § 2703 (2006) of the Federal Stored Communications Act, the Commonwealth sought and obtained court orders to compel the defendants' cellular telephone (cell phone) service providers to provide both defendants' cell tower data

---

[15] Prescott argues here that he was not informed of his rights as required by Commonwealth v. Woods, 466 Mass. at 709. This argument is unavailing because as noted above, see note 9, supra, the court's ruling in Woods was to be applied prospectively, and the grand jury proceedings in the instant case occurred before Woods.

and CSLI.  The records sought and obtained here covered a time period of five days for Prescott (April 29 through May 3, 2010) and seven days for Tewolde (April 29 through May 5, 2010).  The searches sought to obtain information including the cell phones users' proximity to the location of the homicide and calls made to and from the cell phones around the time of the homicide.  The motion judge denied the motions to suppress on the ground that the evidence was obtained by orders that complied with 18 U.S.C. § 2703.

The motion judge did not have the benefit of Commonwealth v. Augustine, 467 Mass. 230 (2014) (Augustine I), S.C., 470 Mass. 837 (2015), and Commonwealth v. Augustine, 472 Mass. 448 (2015) (Augustine II).  Augustine I holds that an individual can have a reasonable expectation of privacy in location information contained in CSLI records and that, therefore, a government-compelled production of such records requires a warrant in compliance with art. 14 of the Massachusetts Declaration of Rights.  Id. at 255.  Before Augustine I, the Commonwealth was required to comply with 18 U.S.C. § 2703(d) in order to obtain a court order to compel such production; the standard of proof under 18 U.S.C. § 2703(d) is less than probable cause under art. 14.[16]  See id. at 236.  The Commonwealth argues that the

_____

[16] A court may issue an order for disclosure of customer communications or records "'only if the governmental entity

defendants did not satisfy the burden of demonstrating a reasonable privacy interest, primarily because the monitoring did not last for a long enough period of time, and Augustine I therefore would not apply. We disagree.

The duration of the search or surveillance is an important factor in determining an individual's reasonable expectation of privacy in cell tower monitoring cases. See Augustine I, supra at 254. Some periods of time are "too brief to implicate the person's reasonable privacy interest," ibid.; tracking for a six-hour period would likely be too short, id. at 255 n.37. By contrast, "the tracking of the defendant's movements in the urban Boston area for two weeks was more than sufficient to intrude upon the defendant's expectation of privacy safeguarded by art. 14" (emphasis added). Id. at 254-255. While the searches here may cover a shorter time period than in Augustine I, each covers a significant amount of time, including both weekdays and weekends, serving as a comprehensive surveillance of the target's daily lives. The surveillances here intruded into the defendants' reasonable expectations of privacy and violate art. 14 if they do not comply with the warrant requirement. See id. at 255.

_____

offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation' (emphases added)." Augustine I, supra at 236, quoting from § 2703(d).

The defendants argue that the Commonwealth's applications for orders pursuant to 18 U.S.C. § 2703 do not demonstrate probable cause. Because Augustine I was issued after the applications were granted here, the motion judge was not required, at the time he made his decision, to determine whether there was probable cause before allowing the surveillance.[17] Pursuant to Augustine I, we remand this case to the motion judge for a hearing to determine whether the Commonwealth's applications met the probable cause standard of art. 14. Id. at 256. See Augustine II, supra at 459 (on remand, motion judge ruled probable cause standard set out in Augustine I had not been met and allowed defendant's motion to suppress CSLI evidence; Supreme Judicial Court reversed, concluding there was probable cause).

Conclusion. We affirm the orders suppressing Tewolde's interview statements and grand jury testimony. We affirm the denial of Prescott's motion to suppress his grand jury testimony. We vacate the denial of the defendants' motions to suppress cellular tower data and CSLI, and remand for further proceedings consistent with this opinion.

                                        So ordered.

---

[17] The court in Augustine I, supra at 257, held that the case would apply to cases in which the conviction is not final, i.e., "to cases pending on direct review in which the issue concerning the warrant requirement was raised." Thus, we apply it here.